## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLORADO

Civil Action No.

_____

**JENNIFER WEBB,**

     Plaintiff,

v.

**ASPEN VIEW ACADEMY,**
**A Colorado public charter school,**

and

**ROBERT BARBER,**
**Principal, in his individual capacity,**

     Defendants.

---

## COMPLAINT

---

COMES NOW, the Plaintiff, Jennifer Webb, and for her Complaint against the Defendants, alleges the following:

### Introduction

1.    Jennifer Webb ("Ms. Webb") alleges that the Defendants, Aspen View Academy ("AVA") and its Principal, Bob Barber ("Mr. Barber"), violated her First Amendment rights by firing her in retaliation for her free speech on a matter of public concern.

2.    Ms. Webb worked for AVA as its Business Manager from July 18, 2017 through the involuntary termination of her employment on October 1, 2021.

3.    During the course of her employment with AVA, Ms. Webb received repeated raises, contract extensions, and merit based bonuses.

1

4.     At the same time, Ms. Webb also discovered financial improprieties and violations of AVA's Finance Policy committed by Mr. Barber over a period of several years, including the routine writing of checks made out to cash without documentation, a repeated failure to provide receipts for purchases made using AVA funds, the purchase of personal electronic devices using AVA funds, and a failure to follow AVA's competitive bidding process, which resulted in hundreds of thousands of dollars of public money, raised via a bond measure for school improvements, being improperly directed to Metropolitan Total Property ("MTP"), a business owned and operated by friends of Mr. Barber.

5.     Disturbed by these irregularities, and concerned about the possibility of criminal activity, Ms. Webb reported Mr. Barber's conduct to the Douglas County School District ("DCSD") on August 19, 2021.

6.     On August 20, 2021, DCSD informed AVA of Ms. Webb's report in a letter to Mr. Barber and Mr. Jonathan Nye, then the AVA Board President.

7.     Given the nature of the report, as well as the supporting documentation provided, AVA and Mr. Barber determined that Ms. Webb made the report to DCSD.

8.     On August 30, 2021, AVA informed its legal counsel of Ms. Webb's report to DCSD.

9.     On August 31, 2021, the General Counsel for DCSD wrote a letter to AVA's attorney stating that, "the concerns expressed in the complaint received are very serious and need to be looked into by appropriate representatives of AVA as soon as possible."

10.    Legal counsel for AVA then hired Heather Diaz ("Ms. Diaz"), the Accounting Process Manager for Falcon School District 49, to investigate some, but not all, of Ms. Webb's allegations.

11.     As part of her investigation, Ms. Diaz reviewed purchases made by Mr. Barber on AVA's credit card from July, 2017 through August, 2021 and found more than $26,000.00 in purchases that were not properly documented or explained by Mr. Barber, including multiple iPads, Beats Headphones, multiple iPhones, an Apple Watch, a Samsung Galaxy Note, several laptops, and a radiator replacement on Mr. Barber's personal vehicle.

12.     In addition, Ms. Diaz also examined reimbursement checks made out to Mr. Barber, or written payable to cash and endorsed by Mr. Barber, from the same time period.

13.     After reviewing those checks, Ms. Diaz discovered another approximately $4,000.00 in expenditures that were not properly documented or explained.

14.     However, AVA did not ask Ms. Diaz to investigate the allegation that Mr. Barber and AVA had failed to engage in a competitive bidding process as required by the AVA Finance Policy before awarding contracts to MTP.

15.     After identifying more than $30,000 in undocumented transactions made by Mr. Barber with AVA funds, Ms. Diaz concluded her report by stating that, "As mentioned previously, all items above are in need of additional supporting documents in order to sufficiently conclude the requested financial audit review/investigation."

16.     However, AVA did not provide Ms. Diaz with any additional documentation or allow her to conclude her independent review of Mr. Barber's transactions.

17.     Instead, AVA assigned its Finance Director, Alex Marino ("Mr. Marino"), to conduct an inventory and conclude the audit of Mr. Barber's transactions.

18.     As the Finance Director, Mr. Marino works under the direct supervision of Mr. Barber, who has the sole the authority to terminate Mr. Marino's employment with AVA.

19.     Mr. Marino's review found that many of the personal electronics purchased by Mr. Barber using AVA's credit card over the prior four years had no receipts and at least some of the electronics could not be located on AVA premises, including the Beats headphones and multiple iPhones.

20.     In addition, Mr. Marino found that Mr. Barber had made several personal purchases using AVA funds, including the radiator replacement, for which Mr. Barber had not reimbursed AVA.

21.     In spite of the missing personal electronics and unreimbursed personal expenses identified in Mr. Marino's report, on September 23, 2021, AVA's legal counsel reported to DCSD that, "In summary, AVA and my office have determined that each of the transactions have been found to be either for the benefit of AVA or, in the case of an automotive transaction, was reimbursed to AVA. Accordingly, AVA concludes that Mr. Barber did not engage in any financial impropriety."

22.     After AVA and its attorney cleared Mr. Barber of any wrongdoing, on September 30, 2021, Ms. Webb reported his conduct to the Castle Rock Police Department ("CRPD").

23.     On October 1, 2021, Mr. Barber pulled Ms. Webb into a meeting in his office attended by three other employees, including a former CRPD police officer.

24.     In that meeting, Mr. Barber terminated Ms. Webb's employment with AVA.

25.     During the termination meeting, Mr. Barber provided Ms. Webb with a written termination letter signed by himself and Mr. Marino.

26.     As detailed below, on the basis of these facts, Ms. Webb now alleges that AVA and Mr. Barber unlawfully terminated her employment in retaliation for her protected First Amendment speech on a matter of public concern: Mr. Barber's personal use of public funds.

27.     Ms. Webb also brings this action to remedy violations of Colorado's Lawful Off Duty Activities Act, C.R.S. § 24-34-402.5

**History of AVA**

28.     AVA is a Pre-K-8th grade charter school that serves the community of Castle Rock and south Douglas County.

29.     AVA is chartered through the DCSD.

30.     In 2011, a group of parents joined together and formed AVA with the laudable goal of providing rigorous academic instruction combined with a "balanced, whole student approach."

31.     In 2012, AVA received a formal charter approving its operation as a public school in the DCSD, including a generous land grant from DCSD that helped AVA develop "a strong financial position."

32.     In 2016, AVA renewed its Charter with DCSD for an additional five years.

33.     In 2017, AVA hired Mr. Bob Barber as its Principal from the Ben Franklin Academy in Highlands Ranch.

34.     From 2017 through the present, Mr. Barber has worked as the Principal of AVA.

35.     AVA's 2016 Charter renewal with DCSD expired on June 30, 2021.

36.     On May 11, 2021, AVA and DCSD entered into a new Charter School Contract for 2021 through 2026.

37.     The May 11, 2021 Charter School Contract between AVA and DCSD became effective July 1, 2021.

38.     The May 11, 2021 Charter School Contract between AVA and DCSD will expire on June 30, 2026.

39.     The May 11, 2021 Charter School Contract between AVA and DCSD was in effect on October 1, 2021.

40.     AVA is a public school.

41.     As a public school, AVA is required to comply with the United States Constitution, including the First Amendment.

42.     AVA funds its operations, in part, with Per Pupil Operating Revenue provided to AVA by the State of Colorado.

43.     The Per Pupil Operating Revenue, and all other funds received by AVA, belong to AVA.

44.     As part of its Charter with DCSD, AVA agreed to comply with all federal, state, and local laws regarding finance and public funds.

45.     AVA also agreed to inform DCSD if any of its employees engaged in misconduct or behavior that may constitute a violation of law or if any AVA employee misappropriated funds.

46.     As part of its Charter, AVA also agreed to keep its funds separate from the funds of any other person, entity, or organization.

**Ms. Webb's Employment History as AVA's Business Manager**

47.     During the course of her employment with AVA, Ms. Webb performed her job duties at a high level as demonstrated by her repeated receipt of contract extensions, raises, and performance bonuses.

48.     After AVA hired Mr. Barber in 2017, he then hired Ms. Webb to work as the Business Manager.

49.     On July 18, 2017, Ms. Webb signed an Employment Agreement with AVA to work full time as its Business Manager for the 2017-2018 school year.

50.     As the Business Manager, Ms. Webb earned a salary of $47,500.00 plus benefits for the 2017-2018 school year.

51.     Mr. Barber signed the 2017-2018 Employment Agreement on behalf of AVA.

52.     For the 2017-2018 school year, Ms. Webb worked under the supervision of Mr. Barber.

53.     Pursuant to the Employment Agreement, Mr. Barber, in his role as AVA's Principal, had the authority to terminate Ms. Webb's employment.

54.     On December 8, 2017, Ms. Webb signed an Addendum to the 2017-2018 Employment Agreement, which raised her salary for the remainder of the school year to $55,000 per year.

55.     Mr. Barber signed the Addendum to the 2017-2018 Employment Agreement on behalf of AVA.

56.     On May 17, 2018, Ms. Webb signed an Employment Agreement to work as AVA's full time Business Manager for the 2018-2019 school year.

57.     Mr. Barber signed the 2018-2019 Employment Agreement on behalf of AVA.

58.     For the 2018-2019 school year, AVA raised Ms. Webb's salary to $56,100.00 per year plus benefits.

59.     On June 5, 2019, Ms. Webb and AVA entered into an Employee Bonus Commitment contract for the 2018-2019 school year.

60.     Mr. Barber signed the Employee Bonus Commitment on behalf of AVA.

61.     Pursuant to the Employee Bonus Commitment, if Ms. Webb met or exceeded the Bonus Metrix she would be eligible to receive a $5,000.00 bonus.

62.     The Bonus Metrix required Ms. Webb to meet the following conditions in order to earn the bonus:

        a.      Employee shall exceed goals, either financial or nonfinancial;

    b.      Employee shall perform additional duties from those listed in duties; and

    c.      Employee shall serve as a good example of professional behavior to other employees and exemplify teamwork, ethics, and leadership.

63.    Ms. Webb met or exceeded the Bonus Metrix for the 2018-2019 school year.

64.    As a result, Ms. Webb received the full $5,000.00 bonus for the 2018-2019 school year.

65.    On June 5, 2019, Ms. Webb signed an Employment Agreement to work as AVA's full time Business Manager for the 2019-2020 school year.

66.    For the 2019-2020 school year, AVA again raised Ms. Webb's salary to $58,630.00 per year plus benefits.

67.    Mr. Barber signed the 2019-2020 Employment Agreement on behalf of AVA.

68.    Also on June 5, 2019, Ms. Webb and AVA entered into an Employee Bonus Commitment contract for the 2019-2020 school year.

69.    Mr. Barber signed the 2019-2020 Employee Bonus Commitment on behalf of AVA.

70.    Pursuant to the Employee Bonus Commitment, if Ms. Webb met or exceeded the Bonus Metrix she would be eligible to receive a $5,000.00 bonus.

71.    The Bonus Metrix required Ms. Webb to meet the following conditions in order to earn the bonus:

    a.      Employee shall exceed goals, either financial or nonfinancial;

    b.      Employee shall perform additional duties from those listed in duties; and

    c.      Employee shall serve as a good example of professional behavior to other employees and exemplify teamwork, ethics, and leadership.

72.    Ms. Webb met or exceeded the Bonus Metrix for the 2019-2020 school year.

73.    As a result, Ms. Webb received the full $5,000.00 bonus for the 2019-2020 school year.

74.     On June 25, 2020, Ms. Webb signed an Employment Agreement to work as AVA's full time Business Manager for the 2020-2021 school year.

75.     For the 2020-2021 school year, AVA again raised Ms. Webb's salary to $65,000.00 per year plus benefits.

76.     Mr. Barber signed the 2020-20201 Employment Agreement on behalf of AVA.

77.     Also on June 25, 2020, Ms. Webb and AVA entered into an Employee Bonus Commitment contract for the 2020-2021 school year.

78.     Mr. Barber signed the 2020-2021 Employee Bonus Commitment on behalf of AVA.

79.     Pursuant to the Employee Bonus Commitment, if Ms. Webb met or exceeded the Bonus Metrix she would be eligible to receive a $5,000.00 bonus.

80.     The Bonus Metrix required Ms. Webb to meet the following conditions in order to earn the bonus:

      a.     Employee shall exceed goals, either financial or nonfinancial;

      b.     Employee shall perform additional duties from those listed in duties; and

      c.     Employee shall serve as a good example of professional behavior to other employees and exemplify teamwork, ethics, and leadership.

81.     Ms. Webb met or exceeded the Bonus Metrix for the 2020-2021 school year.

82.     As a result, Ms. Webb received the full $5,000.00 bonus for the 2020-2021 school year.

83.     On July 22, 2021, Ms. Webb entered into a final Employment Agreement with AVA to work full time as its Business Manager for the 2021-2022 school year.

84.     For the 2021-2022 school year, AVA again raised Ms. Webb's salary to $66,300.00 per year plus benefits.

85.     Mr. Barber signed the 2021-2022 Employment Agreement on behalf of AVA.

86.     Under the 2021-2022 Employment Agreement, Ms. Webb's listed job duties and responsibilities as the Business Manager consisted of acting in accordance with AVA's policies, rules, and regulations.

87.     Under the 2021-2022 Employment Agreement, Ms. Webb participated in the Public Employees Retirement Association ("PERA").

88.     Under the 2021-2022 Employment Agreement, Ms. Webb received health and dental insurance as a benefit of her employment with AVA.

89.     Also on June 3, 2021, Ms. Webb and AVA entered into an Employee Bonus Commitment contract for the 2021-2022 school year.

90.     Pursuant to the Employee Bonus Commitment, if Ms. Webb met or exceeded the Bonus Metrix she would be eligible to receive a $5,000.00 bonus for the 2021-2022 school year.

91.     On October 1, 2021, after Ms. Webb spoke to the DCSD and CRPD, Mr. Barber terminated Ms. Webb's employment with AVA.

92.     On March 7, 2022, Ms. Webb requested a complete copy of her personnel file from AVA pursuant to Colorado law.

93.     On March 23, 2022, counsel for AVA provided Ms. Webb with a complete copy of her personnel file.

94.     Ms. Webb's personnel file from AVA does not contain any negative performance reviews or evaluations.

95.     Ms. Webb's personnel file from AVA does not contain any disciplinary actions.

96.     Ms. Webb's personnel file from AVA does not contain any counselings.

97.      Ms. Webb's personnel file from AVA does not contain any warnings, either verbal or written.

98.     Ms. Webb's personnel file from AVA does not contain an Employee Handbook Acknowledgment page.

99.     Ms. Webb's personnel file from AVA does not contain a job description.

**AVA Delegates Final Authority to Terminate Ms. Webb's Employment to Mr. Barber**

100.    Pursuant to its Charter School Contract with DCSD, AVA has obtained an automatic waiver of DCSD's statutory right to have its Board of Education discharge or terminate AVA personnel, including Ms. Webb.

101.    AVA has also obtained an automatic waiver of DCSD's statutory right to have AVA's Principal submit recommendations for dismissal of personnel.

102.    As a result, pursuant to its Charter contract with DCSD, AVA employs every employee of the school, not DCSD.

103.    Employees of AVA work for AVA "at-will."

104.    For its employees, AVA makes all disciplinary decisions, including termination decisions.

105.    AVA also retains the right to establish its own terms and conditions of employment.

106.    Under AVA's structure, its Principal does not function as a traditional school principal in DCSD.

107.    Instead, AVA's Principal acts as AVA's chief executive officer.

108.    The AVA Board of Directors delegated the school's authority to hire, fire, discipline and otherwise set the terms of conditions of employment solely to AVA's Principal, Mr. Barber.

109.    As AVA's chief executive officer, Mr. Barber has been granted full authority by AVA's Board of Directors to terminate the employment of AVA's employees.

110.    According to AVA's 2021-2022 Employee Handbook, the Principal is responsible for the day to day operations of AVA, including hiring, performance evaluations, and disciplinary matters for employees.

111.    AVA's 2021-2022 Employee Handbook states that termination of employment "will be at the discretion of the Principal."

112.    In addition, AVA's 2021-2026 Charter School Contract with DCSD confirms that, "The AVA Governing Board has delegated responsibility for hiring, discipline and termination of all AVA employees to the administrator."

113.    Mr. Barber's delegated authority to terminate the at-will employees of AVA is final and not subject to review or approval by the AVA Board of Directors or DCSD.

114.    Mr. Barber's delegated authority to terminate the at-will employees of AVA is not constrained by any AVA policy.

**AVA's Finance Policy**

115.    AVA has enacted a Finance Policy to ensure, in part, that AVA's financial assets are protected and managed properly.

116.    AVA's Finance Policy also requires that AVA staff comply with the requirements of federal, state, and local law.

117.    Colorado state law prohibits government employees from using public funds for their personal use or benefit.

118.    Specifically, C.R.S. § 18-8-407 states that, "Every public servant who lawfully or unlawfully comes into possession of any public moneys or public property of whatever description, being the property of the state or of any political subdivision of the state, and who

knowingly converts any of such public moneys or property to his own use or to any use other than the public use authorized by law is guilty of embezzlement of public property."

119.    As a result of these requirements, AVA employees are forbidden from using AVA funds to make personal purchases as a matter of both AVA policy and Colorado state law.

120.    AVA's Finance Policy is also intended to make sure that AVA's staff understands their financial fiduciary responsibilities to AVA.

121.    AVA's Finance Policy also creates specific duties that AVA staff must follow in order to safeguard AVA's funds.

122.    Pursuant to Section 3.2 of AVA's Finance Policy, the Principal is responsible for properly accounting for all of AVA's funds.

123.    Pursuant to Section 5.2 of AVA's Finance Policy, the Board President reviews and approves the Principal's request for reimbursements.

124.    Pursuant to the Finance Policy, employees must provide receipts in order to be reimbursed for purchases or expenditures made on behalf of AVA.

125.    Section 5.2 of AVA's Finance Policy also prohibits AVA from reimbursing employees for items purchased for personal use.

126.    AVA's Finance Policy also establishes formal bidding procedures for the selection and hiring of contractors.

127.    Pursuant to Section 5.1.1 of the Finance Policy, contracts anticipated to cost more than $10,000.00 are subject to formal bidding procedures.

128.    Pursuant to AVA's Finance Policy, contractors are selected based on their qualifications and competence.

129.    The selection of contractors is also required to encourage competition, discourage favoritism, and obtain services at a fair and reasonable price.

130.    Pursuant to Section 5.1.2 of the Finance Policy, AVA employees are required to avoid conflicts of interest in selecting contractors.

**Mr. Barber Begins to Use AVA Funds to Make Personal Purchases**

131.    Following his hiring in 2017, Mr. Barber began to use AVA's funds for his personal benefit without reimbursing AVA.

132.    In 2017 and 2018, Mr. Barber wrote checks drawn on the AVA checking account payable to himself, including in July 2017, June 2018, and July 2018.

133.    Mr. Barber endorsed and cashed the checks made payable to himself.

134.    In 2018, Mr. Barber also wrote at least one check drawn on the AVA checking account payable to cash without providing a receipt.

135.    Mr. Barber endorsed and cashed the check payable to cash.

136.    In 2017 and 2018, Mr. Barber wrote at least $1,250.00 worth of AVA checks payable to himself or cash without providing a single receipt.

137.    In addition, in 2017 and 2018, Mr. Barber also made a series of personal purchases on AVA's credit card.

138.    For example, in June 2018, Mr. Barber charged four separate hotel rooms to the AVA credit card for his personal use.

139.    In January 2019, Mr. Barber charged a rental car to the AVA credit card for his personal use.

140.    In 2018, Mr. Barber purchased three cell phones on the AVA credit card – an iPhone and two Galaxy Notes – without providing receipts.

141.    In particular, on November 29, 2018, Mr. Barber purchased an Ocean Blue Samsung Galaxy Note on AVA's credit card without providing a receipt.

142.    On December 27, 2018, Mr. Barber replaced the Ocean Blue Samsung Note with an iPhone he purchased on AVA's credit card, again without providing a receipt.

143.    On November 23, 2017, Mr. Barber purchased a Chromebook laptop from Target on AVA's credit card without providing a receipt.

144.    From 2017 through 2018, Mr. Barber charged $11,691.50 to AVA's credit card to pay for personal purchases, such as hotel rooms, and undocumented purchases of personal electronic devices, including cell phones, laptops, and tablets.

145.    In her role as Business Manager, Ms. Webb repeatedly requested that Mr. Barber provide documentation for these purchases.

146.    Mr. Barber ignored Ms. Webb's requests for documentation.

### Ms. Webb Reports Mr. Barber's Purchases to AVA's Auditor

147.    AVA conducts yearly audits.

148.    In advance of AVA's 2019 audit, Ms. Webb reported her concerns about Mr. Barber's undocumented purchases to AVA's Board of Directors and its auditor.

149.    The minutes of the March 11, 2019 meeting of AVA's Finance Committee confirm that the auditor found that credit card receipts were missing.

150.    The auditor recommended that AVA revisit its Finance Policy in regard to the collection and management of credit card receipts.

151.    AVA did not change its policies or practices as recommended by its auditor.

152.    Instead, the AVA Board of Directors allowed Mr. Barber to maintain unfettered access to AVA's checking accounts and credit card.

153.    The AVA Board of Directors also allowed Mr. Barber to continue to make personal purchases using AVA funds.

154.    The AVA Board of Directors allowed Mr. Barber to continue to write checks drawn on the AVA checking account that were payable to himself or cash, without providing receipts.

155.    On good faith and belief, as of September 7, 2021, the AVA Board of Directors had not sought reimbursement from Mr. Barber for the personal purchases he made with AVA funds beginning in 2017.

156.    On good faith and belief, as of September 7, 2021, AVA had not received funds from Mr. Barber to reimburse the school for the personal purchases he made with AVA funds beginning in 2017.

**The AVA Board of Directors Fails to Discipline Mr. Barber for His Violations of AVA's Finance Policy**

157.    The instances listed in paragraphs 132 through 144 each violated AVA policy.

158.    AVA did not investigate Mr. Barber for making purchases on the AVA credit card without providing receipts.

159.    AVA did not counsel Mr. Barber for making purchases on the AVA credit card without providing receipts.

160.    AVA did not warn Mr. Barber for making purchases on the AVA credit card without providing receipts.

161.    AVA did not discipline Mr. Barber for making purchases on the AVA credit card without providing receipts.

162.    AVA did not report Mr. Barber to DCSD or CRPD for making purchases on the AVA credit card without providing receipts.

163.    AVA did not seek reimbursement from Mr. Barber for the purchases he made on the AVA credit card without providing receipts.

164.    AVA did not discipline Mr. Barber for making purchases on the AVA credit card without providing receipts.

165.    AVA did not investigate Mr. Barber for writing checks drawn on the AVA checking that were payable to himself or cash without providing receipts.

166.    AVA did not counsel Mr. Barber for writing checks drawn on the AVA checking that were payable to himself or cash without providing receipts.

167.    AVA did not warn Mr. Barber for writing checks drawn on the AVA checking that were payable to himself or cash without providing receipts.

168.    AVA did not report Mr. Barber to DCSD or CRPD for writing checks drawn on the AVA checking that were payable to himself or cash without providing receipts.

169.    AVA did not seek reimbursement from Mr. Barber for the purchases he cash he withdrew from the AVA checking account by writing payable to himself or cash without providing receipts.

170.    AVA did not discipline Mr. Barber for writing checks drawn on the AVA checking that were payable to himself or cash without providing receipts.

171.    AVA did not investigate Mr. Barber for making personal purchases with AVA funds without providing reimbursements.

172.    AVA did not counsel Mr. Barber for making personal purchases with AVA funds without providing reimbursements.

173.    AVA did not warn Mr. Barber for making personal purchases with AVA funds without providing reimbursements.

174.     AVA did not discipline Mr. Barber for making personal purchases with AVA funds without providing reimbursements.

175.     AVA did not report Mr. Barber to DCSD or CRPD for making personal purchases with AVA funds without providing reimbursements.

176.     AVA did not seek reimbursement from Mr. Barber for the personal purchases he made with AVA funds.

177.     AVA did not discipline Mr. Barber for making personal purchases with AVA funds without providing reimbursements.

**Mr. Barber Continues Using AVA Funds to Make Personal Purchases**

178.     After the 2019 audit, the AVA Board of Directors allowed Mr. Barber continued using AVA funds to make personal purchases without reimbursing AVA.

179.     On April 19, 2019, Mr. Barber wrote a check drawn on the AVA checking account payable to cash for $500.00.

180.     Mr. Barber endorsed and cashed the April 19, 2019 check.

181.     Mr. Barber did not provide a receipt or any supporting documentation for the April 19, 2019 check.

182.     On May 31, 2019, Mr. Barber wrote a check drawn on the AVA checking account payable to Robert Barber for $506.92.

183.     Mr. Barber endorsed and cashed the May 31, 2019 check.

184.     Mr. Barber noted that the May 31, 2019 check was for "18-19 Mileage," but did not provide any receipts or documentation.

185.     On June 18, 2019, Mr. Barber wrote a check drawn on the AVA checking account payable to cash for $500.00.

186.    Mr. Barber endorsed and cashed the June 18, 2019 check.

187.    Mr. Barber did not provide a receipt or any supporting documentation for the June 18, 2019 check.

188.    On July 12, 2019, Mr. Barber wrote a check drawn on the AVA checking account payable to cash in an undisclosed amount.

189.    Mr. Barber endorsed and cashed the July 12, 2019 check.

190.    Mr. Barber noted that the July 12, 2019 check was for "Classroom Painting, Landscaping," but did not provide any receipts or documentation.

191.    On October 11, 2019, Mr. Barber wrote a check drawn on the AVA checking account payable to cash for $350.00.

192.    Mr. Barber endorsed and cashed the October 11, 2019 check.

193.    Mr. Barber noted that the October 11, 2019 check was for "Staff appreciation," but did not provide any receipts or documentation.

194.    On August 3, 2020, Mr. Barber wrote a check drawn on the AVA checking account payable to cash for $850.00.

195.    Mr. Barber endorsed and cashed the August 3, 2020 check.

196.    Mr. Barber did not note what the August 3, 2020 check was for and did not provide any receipts or documentation.

197.    In total, Mr. Barber wrote at least $2,700.00 in checks payable either to himself or cash from March 2019 through the present, without providing a single receipt.

198.    After AVA's 2019 audit, Mr. Barber also continued to purchase electronics on AVA's credit card without providing receipts or reimbursements.

199.    For example, on July 10, 2019, Mr. Barber purchased an iPod Air and a set of wireless Beats headphones on the AVA credit card without providing a receipt or reimbursement.

200.    Mr. Barber also continued to make personal purchases on the AVA credit card without providing a reimbursement.

201.    For example, on June 24, 2020, Mr. Barber charged $1,061.41 dollars on the AVA credit card for a radiator replacement and coolant exchange on his personal Ford Explorer.

202.    Again, on January 8, 2019, Mr. Barber charged a personal car rental to the AVA credit card without providing a reimbursement.

203.    From 2019 through July 5, 2021, Mr. Barber's personal purchases, checks written to himself or cash, and undocumented purchases of electronics totaled another $15,365.05.

204.    In her role as Business Manager, Ms. Webb repeatedly requested that Mr. Barber provide documentation for these purchases.

205.    Mr. Barber ignored Ms. Webb's requests for documentation.

**AVA Enters into a Business Relationship with Metropolitan Total Property, Inc.**

206.    On or about March 2018, AVA entered into a business relationship with Metropolitan Total Property, Inc. ("MTP"), a small business owned by Mr. Barber's friend, Mr. Bill Sigler.

207.    MTP provides landscaping services, including aeration, fertilization, sprinkler blowouts, snow removal, and lawn mowing.

208.    On good faith and belief, AVA did not undertake a competitive bidding process before hiring MTP to perform landscaping services.

209.    AVA appears to have paid MTP inflated prices for their landscaping services with very limited documentation of the work performed.

210.    On August 3, 2020, AVA paid MTP $38,460.00 for "land and improvements."

211.    On July 28, 2020, AVA paid MTP $13,348.76 for "land and improvements."

212.    On June 23, 2020, AVA paid MTP $13,600.00 for "repairs and maintenance."

213.    On February 28, 2020, AVA paid MTP $13,625.00 for "land and improvements."

214.    On January 24, 2020, AVA paid MTP $16,200.00 for "land and improvements."

215.    On June 21, 2019, AVA paid MTP $16,642.00 for "land and improvements."

216.    On April 19, 2019, AVA paid MTP $10,068.77 for "land and improvements."

217.    On December 7, 2018, AVA paid MTP $12,635.40 for "lawn care."

218.    On June 30, 2018, AVA paid MTP $2,500.00 for "snow removal services."

219.    However, the National Weather Service records show that Castle Rock received zero (0) inches of snow in the entire month of June, 2018.

220.    Again, on February 5, 2021, AVA paid MTP $6,099.38 for "snow removal services."

221.    By way of comparison, the National Weather Service has documented that it only snowed three (3) inches in Castle Rock the day before.

222.    Based upon these numbers, AVA paid MTP well above market rates for snow removal and other landscape services.

223.    In total, from March 2018 through June 2021, AVA paid MTP more than $250,000.00 for landscaping and snow removal services.

**AVA Issues $25 Million in Charter School Revenue Bonds**

224.    In May 2021, the Colorado Educational and Facilities Authority (CECFA) issued $25,185,000.00 in bonds to AVA to use for facility improvements, property acquisition, and expansion.

225.    Mr. Barber and the AVA Board of Directors controlled the bond revenue and its expenditure.

**AVA Uses Bond Revenue to Hire MTP without a Competitive Bidding Process and Agrees to Pay in Full Before the Project is Permitted or Approved**

226.    Within days of CECFA issuing bonds to AVA, Mr. Barber entered into two substantial, no-bid contracts with MTP.

227.    Just before the bond process finished, Mr. Barber added a $400,000.00 line item for two parking lot expansions to be awarded to MTP without a competitive bidding process.

228.    About this no-bid contract, Mr. Barber explained to Ms. Webb, "We gotta get Bill his money."

229.    MTP then provided AVA with two separate written contracts, both dated June 15, 2021, with a total value of $370,800.00.

230.    Pursuant to the contracts, AVA was required to pay MTP $185,400.00 - half of the total value of the contracts – at signing.

231.    Pursuant to the contracts, AVA was required to pay MTP another $92,700.00 - twenty five percent of the contract – by July 22, 2021.

232.    Pursuant to the contracts, AVA was required to pay MTP another $92,700.00 – the final twenty five percent of the contract – by August 22, 2021.

233.    On June 29, MTP submitted two invoices to AVA for the total value of the contract.

234.    Two days later, on July 1, 2021, Mr. Barber signed a fund requisition for $185,400.00 to be paid to MTP.

235.    Both contracts stipulated that MTP would begin its work by July 1, 2021 and complete its work by August 10, 2021.

236.    MTP did not begin construction on the parking lots by July 1, 2021.

237.    MTP did not complete construction of the parking lots by August 10, 2021.

238.    In fact, MTP did not submit construction plans for approval by the City of Castle Rock until on or about October 4, 2021.

239.    As of February 6, 2022, MTP planned to complete its work on both parking lots in the summer of 2022, approximately nine months after AVA was required by contract to pay MTP in full.

### Ms. Webb Reports Mr. Barber's Personal Use of AVA Funds and No-Bid Hiring of MTP to DCSD

240.    Disturbed by this history of financial irregularities, and concerned about the possibility that AVA's fund had been impermissibly used for personal purposes, Ms. Webb spoke to the DCSD and CRPD about Mr. Barber's conduct.

241.    On August 19, 2021, Ms. Webb delivered a written statement and supporting documents to DCSD outlining her concerns.

242.    Ms. Webb delivered her written statement to DCSD off AVA premises and during non-work hours.

243.    Ms. Webb's report contained a two page, written letter from Ms. Webb.

244.    In her letter, Ms. Webb told DCSD that she is aware of "multiple personal purchases" made by Mr. Barber using the AVA credit card, including for electronic devices that she believes she saw in his children's possession and the repair of his personal vehicle using AVA funds.

245.    Ms. Webb also told DCSD that Mr. Barber had cashed more than $5,000.00 in checks made out to himself or cash.

246.    Ms. Webb also informed DCSD that AVA had hired MTP, a landscaping business owned by Mr. Barber's personal friend, for the parking lot project without a competitive bidding process, including Mr. Barber's statement that, "We gotta get Bill his money."

247.   Ms. Webb also reported to DCSD that AVA had improperly hired children to work under the supervision of their parents in the BASE Program, which had payroll issues earlier in the year when an employee claimed hours they did not work.

248.   Finally, Ms. Webb closed her letter to DCSD by expressing her concern that potential criminal activity had taken place in these financial transactions.

249.   To support the allegations in her letter, Ms. Webb attached one hundred and sixty four (164) pages of financial records, including credit card statements, receipts, reimbursement request forms, and bank records.

250.   The supporting documents attached to Ms. Webb's letter consisted of AVA records that were maintained by Ms. Webb as AVA's Business Manager and kept in Ms. Webb's office.

251.   Based upon the nature of the allegations in Ms. Webb's letter to DCSD, and the fact that the documents produced were in Ms. Webb's control, AVA and Mr. Barber determined that it was Ms. Webb who made the August 19, 2021 report to DCSD.

**DCSD Informs AVA of Ms. Webb's Report**

252.   On August 20, 2021, Ms. Kristin Schmidt, the Choice Programming Coordinator for DCSD, sent a letter to Mr. Barber and Mr. Jonathan Nye, AVA Board President.

253.   Ms. Schmidt's August 20, 2021 letter outlined four distinct categories of allegations contained in Ms. Webb's report to DCSD.

254.   The categories of allegations outlined in Ms. Schmidt's August 20, 2021 letter are:

   a.   That Mr. Barber wrote multiple checks to cash or himself without providing receipts;

   b.   That AVA did not follow its formal bidding procedures or Finance Policy when it awarded a no-bid contract to MTP, including concerns that Mr. Barber might be receiving a kickback from MTP;

    c.   That Mr. Barber had used AVA's credit card to make personal purchases and did not provide receipts as recommended by the March 11, 2019 audit; and

    d.   That AVA hired relatives of AVA employees to work in its BASE program in violation of AVA policy.

255.    In her August 20, 2021 letter, Ms. Schmidt shared a copy of Ms. Webb's report to DCSD with Mr. Barber and Mr. Nye.

256.    Ms. Schmidt requested that AVA investigate each of the allegations raised in Ms. Webb's report.

257.    Ms. Schmidt also requested that AVA provide DCSD with a response to each of the allegations in Ms. Webb's report.

258.    On August 30, 2021, AVA's counsel first learned of Ms. Webb's report to DCSD.

259.    On August 30, 2021, DCSD's General Counsel, Ms. Mary Kay Klimesh, had a phone call with AVA's counsel in which she informed them of Ms. Webb's report to DCSD.

260.    On August 31, 2021, Ms. Klimesh sent a follow up letter to AVA's counsel regarding Ms. Webb's report.

261.    Ms. Klimesh informed AVA that DCSD regarded the report as a serious issue.

262.    Ms. Klimesh also informed AVA that it needed to investigate the allegations as soon as possible.

263.    Ms. Klimesh then forwarded Ms. Webb's report, and its supporting documentation, to AVA pursuant to Section 2.1(B) of the Charter Contract between DCSD and AVA.

264.    DCSD also required AVA to keep DCSD apprised of how it planned to respond to the allegations in Ms. Webb's report.

265.    AVA's counsel received Ms. Webb's written report, and its supporting documentation, on September 2, 2021.

266.    AVA's counsel then met with AVA's Board of Directors to decide how to proceed.

267.    AVA then retained Ms. Heather Diaz, an Accounting Process Manager for Falcon District 49, to investigate Ms. Webb's report as an independent fact-finder and auditor.

268.    AVA's counsel also represents Falcon District 49.

269.    On good faith and belief, AVA's counsel and Ms. Diaz had a pre-existing relationship based upon counsel's representation of District 49.

270.    On September 7 and 8, 2021, AVA placed Ms. Webb and Mr. Barber on administrative leave.

271.    AVA's counsel notified Ms. Webb that she had been placed on administrative leave.

272.    While Ms. Webb and Mr. Barber were on administrative leave, AVA provided Ms. Diaz with access to AVA's records in order to conduct her investigation into Ms. Webb's report.

273.    During her investigation, Ms. Diaz did not speak with Ms. Webb.

274.    However, Mr. Alex Marino, AVA's Finance Director, assisted Ms. Diaz in her investigation.

**AVA Did Not Investigate All of Ms. Webb's Allegations as Required by DCSD**

275.    Ms. Diaz did not investigate every allegation made in Ms. Webb's report to DCSD.

276.    Ms. Diaz did not investigate whether AVA failed to follow its formal bidding procedures when Mr. Barber and the Board of Directors awarded a no-bid contract to MTP.

277.    Ms. Diaz did not investigate whether AVA hired relatives of AVA employees to work in its BASE program in violation of AVA policy.

278.   Ms. Diaz only investigated whether Mr. Barber wrote checks to cash or himself without providing receipts and whether Mr. Barber made personal purchases on AVA's credit card.

**Ms. Diaz Finds More than $30,000.00 in Undocumented Purchases by Mr. Barber**

279.   On September 7, 2021, Ms. Diaz submitted the findings of her audit of the AVA credit card and Mr. Barber's requests for payment/reimbursement.

280.   Ms. Diaz's audit covered the time period from July 2017 through August 2021.

281.   Ms. Diaz noted that the funds in question, both from the credit card and the checking account, are AVA property.

282.   Ms. Diaz found thirty-two (32) separate credit card transactions and nine (9) separate checks cashed by Mr. Barber that were "in need of further backup/explanation."

283.   The thirty-two (32) credit card purchases identified by Ms. Diaz totaled $27,473.81.

284.   The nine (9) checks totaled an additional $3,956.92 plus an unknown amount for one additional check.

285.   In total, Ms. Diaz identified more than $31,430.73 in financial transactions made by Mr. Barber with AVA funds that were not properly documented.

286.   After Ms. Diaz conducted her preliminary investigation and audit, AVA suspended Mr. Barber's ability to use the AVA credit card.

287.   AVA also required Mr. Marino to co-sign any checks written by Mr. Barber.

288.   Ms. Diaz concluded her written findings by stating that, "As mentioned previously, all items above are in need of additional supporting documents in order to sufficiently conclude the requested financial audit review/investigation."

289.   AVA did not provide Ms. Diaz with either documents or an opportunity to conclude her audit and investigation.

290.    Instead, AVA turned over the investigation to Mr. Alex Marino, a subordinate employee of Mr. Barber, to conclude the investigation into Mr. Barber's financial transactions.

### Mr. Marino's Inventory Confirms that Items Purchased by Mr. Barber are not in AVA's Possession and Mr. Barber Has Not Reimbursed AVA for Personal Purchases

291.    Mr. Marino conducted a personal inventory into the transactions identified in Ms. Diaz's written audit report.

292.    Mr. Marino's inventory confirmed that Mr. Barber had made at least six personal purchases using AVA funds from 2018 through 2020 for which AVA had not received funds for reimbursement.

293.    Those personal purchases included hotel rooms used on summer vacation, a car rental, and the repair of Mr. Barber's personal vehicle.

294.    In addition, Mr. Marino's inventory confirmed that at least five personal electronic devices purchased by Mr. Barber with the AVA credit card could not be located anywhere on AVA's property.

295.    The missing personal electronic devices include two (2) iPhones, a Galaxy Note phone, a Chromebook laptop, and a pair of Beats wireless headphones.

296.    On good faith and belief, the missing personal electronic devices that could not be located on AVA property were in the personal possession of Mr. Barber (or persons to whom he had gifted the devices).

### AVA and Its Legal Counsel Clear Mr. Barber of Financial Improprieties

297.    In spite of Ms. Diaz's and Mr. Marino's findings, the AVA Board of Directors and AVA's counsel cleared Mr. Barber of any financial improprieties.

298.    On September 23, 2021, AVA's counsel sent a letter to Mr. Troy Schroeder, the new President of the AVA Board of Directors, and Ms. Klimesh.

299.    In his letter, AVA's counsel stated that, "AVA concludes that Mr. Barber did not engage in financial impropriety."

300.    AVA's counsel further alleged that, "We find no evidence of improper benefit or personal aggrandizement in the course of these transactions and Mr. Barber is cleared of all allegations."

301.    AVA did not counsel Mr. Barber for the improper transactions and conduct identified by Ms. Diaz and Ms. Marino.

302.    AVA did not warn Mr. Barber for the improper transactions and conduct identified by Ms. Diaz and Mr. Marino.

303.    AVA did not discipline Mr. Barber for the improper transactions and conduct identified by Ms. Diaz and Mr. Marino.

304.    AVA did not fire Mr. Barber for the improper transactions and conduct identified by Ms. Diaz and Mr. Marino.

### Ms. Webb Reports Mr. Barber's Financial Improprieties to CRPD

305.    On September 30, after AVA and its counsel cleared Mr. Barber of any financial impropriety, Ms. Webb wrote an email to the CRPD to report "our principal's embezzlement of funds" from "a Charter School in Castle Rock."

306.    Ms. Webb sent her email to the CRPD on her personal email address.

307.    Ms. Webb sent her email to CRPD while off duty.

308.    Ms. Webb sent her email to CRPD while off AVA premises.

### Mr. Barber Terminates Ms. Webb's Employment with AVA

309.    On October 1, 2021, the day after Ms. Webb reported his conduct to the CRPD, Mr. Barber pulled Ms. Webb into a meeting in his office attended by three other employees, including a former CRPD police officer.

310.    In that meeting, Mr. Barber terminated Ms. Webb's employment with AVA.

311.    In his role as AVA's chief executive officer, Mr. Barber made the final decision to terminate Ms. Webb's employment.

312.    Mr. Barber signed the letter terminating Ms. Webb's employment.

313.    Mr. Barber's decision to terminate Ms. Webb's employment represented the official policy of AVA with regard to Ms. Webb's employment.

314.    Mr. Barber's stated reason for the termination is that Ms. Webb did not act in accordance with the Standards of Performance in her Employment Agreement.

315.    Mr. Barber's stated reason for the termination of Ms. Webb's employment is false.

316.    Prior to the termination of her employment, Ms. Webb's job performance as Business Manager had been outstanding as demonstrated by her receipt of a raise every year of her employment, new contracts, repeated receipt of merit bonuses based upon her job performance, professionalism, teamwork, ethics, and leadership, and the lack of any disciplinary history or warnings in her personnel file.

317.    AVA also did not follow its progressive disciplinary system for Ms. Webb.

318.    AVA uses a three part corrective action procedure for employees who have violated school policy or need to improve their work performance.

319.    AVA's three part corrective action procedure is intended "to ensure that employees are treated fairly" and that employees receive "a reasonable opportunity to improve the situation."

320.    AVA's three part corrective action procedure states that employees will receive 1) a verbal warning; 2) two written warnings, which will contain standards for improvement, if no improvement is made following the verbal warning; and 3) a suspension or termination.

321.    Mr. Barber and AVA never provided Ms. Webb with a verbal warning.

322.    Mr. Barber and AVA never provided Ms. Webb with any written warnings.

323.    Mr. Barber and AVA never provided Ms. Webb with any standards for improvement.

324.    In fact, Mr. Barber and AVA never told Ms. Webb that she had not met her standards of performance until it had already decided to terminate her employment.

325.    Instead, the decision to terminate Ms. Webb's employment with AVA was motivated by the fact that Ms. Webb reported Mr. Barber's financial improprieties to both the DCSD and the CRPD.

326.    Mr. Barber knew that his stated reasons for the termination of Ms. Webb's employment were false.

327.    Mr. Barber also knew that firing an employee in retaliation for their personal, non-disruptive speech on a matter of public concern would violate that employee's rights as guaranteed by the First Amendment of the United States Constitution.

328.    In spite of knowing that terminating Ms. Webb's employment would violate her constitutional rights, Mr. Barber and AVA chose to terminate her employment anyway.

**First Cause of Action**
**(Retaliation for Protected First Amendment Speech on a Matter of Public Concern against AVA and Barber pursuant to 42 U.S.C. § 1983)**

329.    All prior paragraphs are incorporated herein by reference.

330.    Ms. Webb spoke to both the DCSD and the CRPD regarding Mr. Barber's personal use of AVA funds.

331.    Ms. Webb spoke to the DCSD and the CRPD in her role as a private citizen.

332.    Ms. Webb did not speak to the DCSD and CRPD pursuant to her official job duties.

333.    Ms. Webb spoke to the DCSD and CRPD on a matter of public concern: the personal use of public funds by a government employee.

334.    Ms. Webb's speech to the DCSD and CRPD did not disrupt the operation of AVA or negatively impact its educational mission.

335.    AVA and Mr. Barber's decision to terminate Ms. Webb's employment with AVA was motivated by the fact that Ms. Webb reported his financial improprieties to both the DCSD and the CRPD.

336.    Mr. Barber was the final policymaking authority for AVA regarding the firing of AVA employees.

337.    Mr. Barber exercised his final policymaking authority to terminate Ms. Webb's employment with AVA.

338.    Mr. Barber and AVA caused the termination Ms. Webb's employment in retaliation for exercising her constitutional right to speak on matters of public concern.

339.    Mr. Barber and AVA thereby deprived Ms. Webb of her rights, privileges, and immunities as secured by the First Amendment of the United States Constitution.

340.    Mr. Barber and AVA acted with intentional, willful, and malicious and/or reckless disregard of Ms. Webb's rights as secured by the First Amendment and 42 U.S.C. § 1983.

341.    The right to engage in private speech to report the illicit or improper activities of a public employee, including corruption, impropriety, and malfeasance, is clearly established.

342.    The termination of Ms. Webb's employment by Mr. Barber and AVA for her protected speech represented the official custom, policy, or practice of AVA.

343.   The termination of Ms. Webb's employment occurred under color of state law.

344.   The acts of the AVA and Mr. Barber have caused Ms. Webb great mental anguish, humiliation, degradation, physical and emotional pain and suffering, inconvenience, lost wages and benefits, future pecuniary losses, and other consequential damages.

## Second Cause of Action
### (Retaliation for Lawful Off-Duty Activity against AVA)

345.   All prior paragraphs are incorporated herein by reference.

346.   AVA employed the Plaintiff, Ms. Webb.

347.   While employed by AVA, Plaintiff engaged in lawful activities off the premises of AVA during non-working hours as described above.

348.   AVA terminated Ms. Webb's employment because she engaged in lawful activities off of Defendant's premises during non-working hours.

349.   The termination of Ms. Webb's employment violated C.R.S. § 24-34-402.5.

350.   As a result of the termination of her employment, Ms. Webb has been deprived of wages and benefits.

## Prayer for Relief

WHEREFORE, Plaintiff prays for the following relief, pursuant to 42 U.S.C. §§ 1981a, 1988, C.R.S. § 24-34-402.5, and Fed. R. Civ. P. 54:

a.   Nominal damages;

b.   Nonpecuniary and compensatory damages, including damages for emotional distress and consequential damages;

c.   Punitive damages against Principal Barber in his individual capacity;

d.   Reinstatement or front pay in lieu of reinstatement;

e.   Back pay, including loss of wages and benefits,;

f.      A declaration that Defendants' conduct violated Plaintiff's rights under the First

Amendment;

g.      Pre- and post-judgment interest at the highest rate allowed by law;

h.      Costs and reasonable attorneys' fees pursuant to Fed. R. Civ. P. 54; 42 U.S.C. §

1988, and C.R.S. § 24-34-402.5; and

i.      All other legal or equitable relief to which Plaintiff is entitled.

## JURY DEMAND

**Plaintiffs request this matter be tried by a jury.**

Respectfully submitted this 2nd day of June, 2022.

CORNISH & DELL'OLIO, P.C.


s/Bradley J. Sherman
Bradley J. Sherman, # 39452
Cornish & Dell'Olio, P.C.
431 N. Cascade Avenue, Suite 1
Colorado Springs, CO 80903
719-475-1204
719-475-1264 (fax)
bsherman@cornishanddellolio.com
Attorney for Plaintiff

Plaintiff's address:
6019 Jaguar Way
Lone Tree, CO 80124