**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO**

Civil Action No. 22-cv-01391-STV

JENNIFER WEBB,

      Plaintiff,

v.

ASPEN VIEW ACADEMY; and
ROBERT BARBER,

      Defendants.

_____

**ORDER**
_____

Magistrate Judge Scott T. Varholak

      This matter comes before the Court on Plaintiff's Renewed Motion for Summary Judgment ("Plaintiff's Motion") [#81] and Defendants' Renewed Motion for Summary Judgment ("Defendants' Motion") [#83] (collectively, the "Motions").  The Motions are before the Court on the parties' consent to have a United States magistrate judge conduct all proceedings in this action and to order the entry of a final judgment.  [##11; 14]  This Court has carefully considered the Motions and related briefing, the entire case file, and the applicable case law, and has determined that oral argument would not materially assist in the disposition of the Motions.  For the following reasons, each Motion is GRANTED IN PART and DENIED IN PART as set forth below.

I.    **BACKGROUND**[1]

Defendant Aspen View Academy ("AVA") is a public school, chartered through the Douglas County School District ("DCSD").   [#91-1, PSOF1]   Defendant Robert Barber has worked as the Principal of AVA from 2017 through the present.   [#92-1, DSOF5]   Plaintiff Jennifer Webb worked as AVA's Business Manager from August 1, 2017 until October 1, 2021, when AVA terminated her employment.   [#91-1, PSOF24]

A.    **Plaintiff's Responsibilities**

As Business Manager, Plaintiff did not have a formal job description, and the parties dispute the precise contours of Plaintiff's job duties—particularly as it related to the supervision of Mr. Barber's finances.   [#92-1, DSOF7-8, 12-15]   Plaintiff's job generally consisted of "financial and compensation-related duties," including basic bookkeeping, maintaining accounts receivable and accounts payable, and entering payroll.   [*Id.*, DSOF8-9, 11]   This included reviewing credit card and purchasing card statements each month.   [*Id.*, DSOF12]    The AVA Finance Policy states that the Business Manager has the authorization to approve expense reimbursement "except his or her own and the Principal's."   [#81-35 at 12-13]   The Board President was ultimately responsible for approving the Principal's reimbursement.   [*Id.*]   While Plaintiff was not "responsible for" Mr. Barber's spending, she nevertheless periodically received and reviewed receipts and statements from him as part of the bookkeeping process.   [#81-12 at 7 (24:9-25:16)]   Plaintiff also oversaw capital assets (defined as equipment and

---

[1] The undisputed facts are drawn from the Separate Statement of Facts filed with Plaintiffs' Motion for Summary Judgment [#91-1] and Defendants' Motion for Summary Judgment [#92-1].  The Court refers to the sequentially numbered facts set forth in the Separate Statement of Facts associated with Defendants' Motion as "DSOF#" and those associated with Plaintiffs' motion as "PSOF#."  For additional context, the Court also cites directly to the exhibits submitted by the parties.

2

electronics with a value of more than $10,000), and handled payments and accounting matters with third-party vendors.  [#92-1, DSOF16-17]

Plaintiff's duties included reporting financial discrepancies or concerns to AVA. [*Id.* at DSOF19]  Plaintiff would also submit certain periodic reports regarding AVA's finances to DCSD.  [*Id.* at DSOF18; #81-12 at 20 (74:12-75:17)]  These submissions included business reports, profit and loss statements, year to date financials, and balance sheets.  [#91-1, PSOF196]  DCDS never employed or supervised Plaintiff during her employment with AVA, and Plaintiff did not fall within DCDS's chain of command.  [*Id.* at PSOF26-27, 29]

**B.    Plaintiff's Employment History and the AVA Disciplinary Process**

Plaintiff received a raise each year of her employment with AVA.  [*Id.* at PSOF41-47]  Plaintiff also signed written "Employee Bonus Commitments" for every school year except her first.  [*Id.* at PSOF48]  AVA's "Employee Bonus Commitment" set forth the following "Bonus Metrix:"   the employee shall exceed goals, either financial or nonfinancial; the employee shall perform additional duties from those listed in duties; and the employee shall serve as a good example of professional behavior to other employees and exemplify teamwork, ethics, and leadership.  [*Id.* at PSOF51]  An employee would be eligible for the bonus if the employee received performance reviews meeting or exceeding the Bonus Metrix and was employed on the day the bonus was to be paid and had not announced an intent to resign either verbally or in writing.  [*Id.* at PSOF49]  Plaintiff earned the maximum performance bonus of $5,000 each year that it was offered.  [*Id.* at PSOF50]

The AVA Employment Handbook establishes a progressive three-part corrective action procedure for the same or similar conduct that is designed to offer the employee a reasonable opportunity to improve the situation. [*Id.* at PSOF58-60] The first step is to provide an employee with a verbal warning. [*Id.* at PSOF61] The second step is to provide up to two written warnings, which will include standards for improvement. [*Id.* at PSOF62] The third step is to suspend or discharge the employee at the discretion of the Principal. [*Id.* at PSOF63] Plaintiff's personnel file from AVA does not contain any of the following:  negative performance reviews or evaluations; disciplinary actions; counselings; or verbal or written warnings. [*Id.* at PSOF66-69] Mr. Barber, testifying on behalf of AVA, described Plaintiff's "job performance during her years as [AVA's] business manager" as "[o]verall, satisfactory." [*Id.* at PSOF71; #81-7 at 7 (28:22-25)] Plaintiff did receive counseling from AVA regarding inappropriate comments made by Plaintiff regarding another AVA employee in 2019. [#92-1, DSOF64, 68] The parties dispute whether any other counselings occurred. [#92-1, DSOF59, 61-67]

### C.  Plaintiff's Financial-Related Reports to the Douglas County School District and the Castle Rock Police Department

Beginning in 2017, Plaintiff discovered a series of ongoing practices by Mr. Barber that Plaintiff considered to be financial improprieties and violations of AVA's Finance Policies. [#91-1, PSOF72; #92-1, DSOF21] These improprieties included writing checks made out to cash without documentation and using an AVA credit card for personal purchases, or at least without providing receipts showing that these purchases were made for the benefit of AVA. [#92-1, DSOF21-23]

In 2019, Plaintiff raised her concerns about Mr. Barber's use of the purchasing card to AVA's auditor as part of AVA's 2018 audit. [#91-1, PSOF126] While concerns

4

regarding AVA's "Finance Policy around collecting and managing credit card receipts" were discussed at a March 11, 2019 Finance Committee meeting, AVA did not amend its Finance Policy in regard to collecting and managing credit cards at this time. [*Id.* at PSOF127-129]

At some point, Plaintiff became concerned that AVA's competitive bidding process had not been followed with regards to a contract between AVA and Metropolitan Total Property, Inc. ("MTP"), a landscaping company owned by a friend of Mr. Barber. [#92-1, DSOF24] Plaintiff uncovered the facts that formed the basis for her financial concerns primarily through the performance of her work as Business Manager. [*Id.* at DSOF25-27]

Alarmed by Mr. Barber's financial practices, on August 16, 2021, Plaintiff reached out to the Accounting Office at DCSD for guidance on how to proceed. [#91-1, PSOF74-77] Specifically, Plaintiff contacted the person at DCSD that she "reported to—reported things" to. [#92-1, DSOF49; #83-5 at 14 (91:6-12)] Plaintiff was informed that her claim could be submitted to DCSD, and that DCSD would then notify the Board of Directors for AVA. [#91-1, PSOF80; #83-5 at 14 (93:18-21)] Plaintiff expressed concern for maintaining anonymity, as she feared that AVA might not support her and she may lose her job. [*Id.* at PSOF81]

Acting on the guidance that she received, on August 19, 2021, Plaintiff hand-delivered an anonymous report to DCSD (the "Financial Report") outlining her concerns with Mr. Barber's use of public funds. [#91-1, PSOF85; #92-1, DSOF30] The Financial Report alleged that Mr. Barber had made numerous personal purchases using the AVA credit card, failed to submit required receipts for multiple purchases on the AVA credit

card, and cashed more than $5,000 in checks drawn on the AVA checking account and made out to himself or to cash.   [#91-1, PSOF110-116; #92-1, DSOF33-34]   The Financial Report also detailed Mr. Barber's failure to follow AVA's competitive bidding process with regard to the MTP contract [#91-1, PSOF117; #92-1, DSOF35], and asserted that AVA had violated its anti-nepotism policy by improperly hiring children to work under the supervision of their parents [#91-1, PSOF119; #92-1, DSOF36]. Finally, the Financial Report alleged that AVA discriminated against its female employees by paying "men at significantly higher rates than women to do the same job." [#91-1, PSOF121; #92-1, DSOF37]

The Financial Report included 164 pages of supporting financial records, including credit card statements, receipts, reimbursement request forms, and bank records.  [#91-1, PSOF85; #92-1, DSOF30]  These supporting records were business records used by Plaintiff in the course of her work as Business manager, and stored in Plaintiff's AVA office.  [#91-1, PSOF87]  Plaintiff compiled the supporting records in her AVA office on a Sunday, with the help of AVA's Business Assistant, Karen Allspach. [#91-1, PSOF386; #92-1, DSOF41, 43]   Plaintiff typed the Financial Report on her personal computer at home.  [#91-1, PSOF204]  DCSD did not observe any disruption at AVA as a result of the Financial Report, nor did DCSD receive any reports of disruption.  [*Id.* at PSOF379-380]

In August 2021, DCSD sent a copy of Plaintiff's Financial Report and its attached documents, along with a cover letter, to AVA's counsel, Brad Miller.  [*Id.* at PSOF213] The cover letter requested that AVA investigate each category of allegations raised in the Financial Report, specifically:  (1) checks written to cash by Mr. Barber with no

receipts attached; (2) failure to follow formal bidding procedures with respect to the MTP contract; (3) AVA credit card misuse and documentation; and (4) hiring of relatives and payroll inconsistencies.  [*Id.* at PSOF214]  Initially, Mr. Miller only informed AVA's Board Vice President and Board President that there were allegations of financial misconduct made against Mr. Barber.  [*Id.* at PSOF219]  Mr. Miller suspected that Plaintiff had written the Financial Report.  [*Id.* at PSOF382]

On September 2, 2021, Mr. Miller contacted Ms. Heather Diaz to conduct an audit into Mr. Barber's credit card purchases and use of the AVA checking account.  [*Id.* at PSOF222]  Mr. Miller informed Ms. Diaz in a September 3, 2021 email that he would "have the complainant and Bob [Barber] out of the building on Tue/Wed" in order for Ms. Diaz to conduct an in-person audit.  [*Id.* at PSOF231]  This email addressing "the complainant" was forwarded to AVA's Board President, Board Vice President, and Finance Director.  [*Id.* at PSOF232]  AVA placed both Plaintiff and Mr. Barber (but no other individuals) on paid administrative leave for September 7, 2021, which was the Tuesday following September 3, 2021.  [*Id.* at  PSOF240-241]  Plaintiff asserts that the audit findings substantiated the allegations in the Financial Report, and Defendants do not appear to dispute this fact.  [*Id.* at PSOF221; *see also id.* at PSOF229-320] Following the audit, Mr. Barber was given a copy of the audit findings and was interviewed about the allegations in Plaintiff's Financial Report.  [*Id.* at PSOF321, 323]

On September 8, 2021, AVA's Finance Director sent the following email to Mr. Miller:  "On September 7, 2021, at approximately 8:30 am, Karen Allspach came into my office and verbally told me that she helped Jennifer Webb compile documentation to send to [DCSD] alleging misuse of funds by Principal Robert Barber."  [#91-1,

PSOF384]  AVA's Finance Director worked under the direct supervision of Mr. Barber. [#91-1, PSOF331]  The parties dispute whether Mr. Barber had seen a copy of Plaintiff's Financial Report or knew that Plaintiff had written the Financial Report at the time of Plaintiff's termination.  [#92-1, DSOF84]

On the evening of September 30, 2021, Plaintiff sent an email to Commander Jason Lyons of the Castle Rock Police Department ("CRPD") with the subject line: "Crime to report."  [#91-1, PSOF137-138]  In the CRPD email, Plaintiff stated that she worked "at a charter school in Castle Rock" and had evidence of the "principal's embezzlement of funds."  [#91-1, PSOF139]  In response to the email, CRPD asked to contact Plaintiff for the name of the charter school and the type of information that Plaintiff had.  [#92-1, DSOF71]  Plaintiff never responded.  [*Id.* at DSOF72]  As discussed below, there is no evidence that either AVA or Mr. Barber had notice of the CRPD email at the time that Plaintiff was terminated.  [*Id.* at DSOF74]

### D.    Plaintiff's Facebook Posts and Public Health Report to Douglas County School District

On July 8, 2020, Plaintiff posted a response in an ongoing Facebook thread regarding vaccine mandates.[2]  [#91-1, PSOF142]  Plaintiff's post stated that Plaintiff "did lots of research and vaccinated [her] son and daughter. You're welcome."  [*Id.* at PSOF143]  In response to Plaintiff's post, a parent of an AVA student stated that someone should "pass the cookie to this gal."  [*Id.* at PSOF144]  A back and forth exchange ensued, in which the other individual called Plaintiff a "bitch" and said that she

---

[2] While the actual topic of the conversation was the HPV vaccine, Defendants do not dispute that, at the time that Plaintiff was terminated, both AVA and Mr. Barber assumed that Plaintiff's post was about the COVID-19 vaccine.  [#91-1, PSOF437, 446]

pitied Plaintiff's children.  [*Id.* at PSOF145]  Plaintiff told the individual to "enjoy your cancer" and "maybe check you[r] references."  [*Id.* at PSOF146]

On September 22, 2021, Plaintiff made a Facebook post on her personal page expressing Plaintiff's opinions about the COVID-19 vaccine.  [*Id.* at PSOF150]  The September 22 Facebook post notes that Plaintiff is vaccinated and provides, in a lengthy paragraph, various reasons as to why.  [*Id.* at PSOF151]  In the post, Plaintiff states that:  "Conspiracy theories, and big pharma stuff is bullshit . . . STFU[3]!!"  [*Id.* (ellipsis in original)]  The September 22 Facebook Post does not tag or mention any other individual, and there is no indication that it was made in response to a post from anyone else.  [*Id.* at PSOF152; *see also* #81-23]

Plaintiff's Facebook posts were not made pursuant to Plaintiff's job duties at AVA.   [#91-1, PSOF188]   Defendants do not know when they became aware of Plaintiff's Facebook posts, but it was probably soon after they were made.  [*Id.* at PSOF371, 374, 387, 434]  When informed of the Facebook posts, in both instances, Mr. Barber did not instruct that any disciplinary action be taken.  [*Id.* at PSOF372, 375]  Plaintiff's July 8, 2020 Facebook post resulted in "a few conversations with parents and staff [who] felt that [the post] was an unprofessional, inappropriate remark to put on social media."  [*Id.* at PSOF366, 370]  Plaintiff's September 22, 2021 Facebook post resulted in questions from unidentified individuals as to whether it was "professional for an employee of the school to be posting on a social media platform," and "multiple people" shared the post with AVA's Human Resources Director.  [*Id.* at PSOF376]  Mr.

---

[3] "For those unfamiliar with the term, 'stfu' is an acronym for a particularly emphatic way to tell someone to be quiet: 'Shut the f*** up!'"  *United States v. Zimny*, 846 F.3d 458, 464 n. 6(1st Cir. 2017) (citation omitted).

Miller testified that, during this time, "seemingly there was no one involved in [AVA] that didn't have some sort of social media posting on one side or the other on this.  They were just—you could kind of glaze over."  [*Id.* at PSOF357]

On September 24, 2021, Plaintiff wrote an email to individuals at DCSD reporting AVA's ongoing failure to comply with the Public Health Orders that required masking in public schools.  [#92-1, DSOF88]  As discussed below, Plaintiff has no evidence that either AVA or Mr. Barber had notice of this email before Plaintiff's termination.  [*Id.* at DSOF89-90]

###     E.     The Termination Process

In late July 2021, members of the AVA Board expressed an opinion that Plaintiff's employment should be terminated.  [#91-1, PSOF401; #81-15 at 26-27 (104:21-105:9)]  Mr. Barber was described as a "diligent protector of [Plaintiff]" during that time and Plaintiff's employment was not terminated.  [#91-1, PSOF402]

On or around September 26 or 27, 2021, Mr. Barber recommended to AVA's Board President, Troy Schroeder, and AVA's Board Vice President, Julie Casten, that AVA should consider terminating Plaintiff's employment.   [*Id.* at PSOF403]   On September 27, Mr. Schroeder "re-raised" the issue of terminating Plaintiff's employment with Mr. Miller.[4]  [*Id.* at PSOF404]  Also on September 27, AVA's Director of Human Resources, Donia Garcia, sent emails to Mr. Schroeder and Ms. Casten containing images of the Facebook posts described above as well as other examples of Plaintiff's conduct.  [*Id.* at PSOF405-409]  One email noted that Ms. Garcia had "spoke[n] with

_____

[4] Mr. Miller testified that he had previously discouraged AVA from terminating Plaintiff during the pendency of the investigation into Plaintiff's allegations of financial misconduct, and that Mr. Schroeder was "probably wanting to have the issue be reconsidered" now that the complaint was resolved.  [#81-15 at 28 (111:2-112:2)]

[Mr. Barber] about this, [and] he thought it would be best if [Ms. Garcia] shared with [Mr. Schroeder and Ms. Casten]."  [*Id.* at PSOF407]  Mr. Schroeder forwarded Ms. Garcia's email to Mr. Miller, deeming the included incidents "more examples of unprofessional behavior" by Plaintiff and asking: "What are the next steps with [Plaintiff]?"  [*Id.* at PSOF410]

On September 28, Mr. Schroeder sent an email scheduling a call to discuss "[n]ext steps with [Plaintiff]," who he described as "an absolute cancer."  [*Id.* at PSOF413-414]  A call including Mr. Schroeder, Ms. Casten, Mr. Miller, and possibly Mr. Barber took place, during which time they briefly discussed "whether [they] needed to do anything more in terms of building a case before they made a decision" to terminate Plaintiff.  [*Id.* at PSOF416-417]  On September 29, Ms. Garcia searched for and emailed to Mr. Miller additional instances of alleged misconduct and unprofessional behavior by Plaintiff dating back to 2019 stating that "[t]his is what [she was] able to find at this time."  [*Id.* at PSOF419-421]  On September 30, Ms. Garcia sent Mr. Miller another email stating that she "came in super early . . . to see what [she] could find" and including documentation related to a Short-Term Disability claim by another employee.  [*Id.* at PSOF422-423]

AVA terminated Plaintiff's employment on October 1, 2021, around 10:00 a.m. [*Id.* at PSOF424; #92-1, DSOF92]  Mr. Barber made the final decision to terminate Plaintiff's employment.  [#91-1, PSOF429]  AVA gave Plaintiff a termination letter on October 1, 2021, signed by Mr. Barber and AVA's finance director.  [*Id.* at PSOF425]  As grounds for termination, the termination letter cites:  Plaintiff's "decision to seek disability insurance payments during a period for which [Plaintiff was] being fully

compensated on a salary basis by AVA;" Plaintiff's use of "inappropriate language in public areas of the school" and use of "sarcastic and accusatory terms in multiple written and verbal exchanges with co-workers;" and Plaintiff's failure to establish "even rudimentary protocols for financial checks and balances, inventory tracking, reimbursements, and other basic transactional items." [#92-1, DSOF77] Plaintiff asserts that, with respect to the disability insurance issue, any error or improper representation was on the portion of the application completed by AVA, and not the result of any action taken by Plaintiff. [*Id.* (Plaintiff's response, stating: "The responsibility for informing the insurance company that [Plaintiff's] salary had not stopped was Ms. Garcia's and she did not fill out that portion of the application.")] With respect to the financial protocols issue, Plaintiff asserts that the primary responsibility for establishing an inventory control system at AVA rested with the Principal. [*Id.*] Moreover, the only missing protocol identified by Mr. Barber was an inventory tracking system, but Mr. Barber did not learn that this system was missing until after Plaintiff's termination. [*Id.*] Mr. Miller similarly testified that the lack of development of protocols was not a reason for Plaintiff's termination. [*Id.*]

AVA's termination letter further asserts, in part, that Plaintiff "consistently failed to use best efforts to promote the interests and goals of AVA." [#91-1, PSOF430] When asked to identify how Plaintiff had failed in this respect, Ms. Garcia identified, in part, the July 8 and the September 22 Facebook posts. [*Id.* at PSOF431] Similarly, Mr. Barber testified that these posts were, respectively, a "small piece" of what was considered when terminating Plaintiff, and "part of the reason" for Plaintiff's termination. [*Id.* at DSOF432-433]

F.     **This Lawsuit**

Plaintiff initiated this lawsuit on June 2, 2022.  [#1]  Plaintiff's original complaint alleged that "AVA and Mr. Barber unlawfully terminated [Plaintiff's] employment in retaliation for her protected First Amendment speech on a matter of public concern:  Mr. Barber's personal use of public funds."  [#1 at ¶ 26]  On this basis, Plaintiff asserted one claim against both AVA and Mr. Barber under 42 U.S.C. § 1983 for Retaliation for Protected First Amendment Speech [*id.* at ¶¶ 329-344], and one claim against AVA under Colo. Rev. Stat. § 24-34-402.5 for Retaliation for Lawful Off-Duty Activity [*id.* at 345-350].  Neither Plaintiff's Complaint nor the Scheduling Order entered in this matter contain any allegation or statement relating to Plaintiff's speech regarding vaccines and COVID-19.  [*See generally id.*; #17 at 1-4]

On March 24, 2023, during the course of discovery, Plaintiff identified her September 24 email to DCSD regarding AVA's compliance with Public Health Orders as an "instance[] in which [Plaintiff] spoke as a private citizen on matters of public concern that are relevant to the claims and defenses in this case."  [#40-8 at 24-25 (response to Interrogatory No. 15)]  On May 8, 2023, Defendants supplemented their Rule 26(a)(1)[5] disclosures and provided Plaintiff with Ms. Garcia's email that contained the Facebook posts at issue, which was sent to Mr. Miller, Mr. Schroeder, and Ms. Casten on September 27, 2021.  [#55-40 at 1 (disclosing "DEF 001081-DEF 001140"); *see also* #42-52 at 1-4 (Ms. Garcia's email containing screenshots of Plaintiff's Facebook Posts, labelled DEF-001087 through DEF-001090)]  Plaintiff supplemented her response to

---

[5] Among other things, Federal Rule of Civil Procedure 26(a)(1) requires that "a party must, without awaiting a discovery request, provide to the other parties . . . a copy . . . of all documents . . . that the disclosing party has in its possession, custody, or control and may use to support its claims or defenses."  Fed. R. Civ. P. 26(a)(1)(ii).

Interrogatory No. 15 to include the Facebook Posts as "instances in which [Plaintiff] spoke as a private citizen on matters of public concern that are relevant to the claims and defenses in this case." [#56-2 at 3-4]

On July 19, 2023, the parties filed cross-motions for summary judgment. [##40; 42] Plaintiff's motion for summary judgment relied on her speech related to vaccines and COVID-19 in support of her claims. [#42 at 6-8, 14-16] In the Final Pretrial Order, submitted by the parties on August 9, 2023 and entered by the Court on August 16, 2023, Plaintiff included both the Public Health email sent to DCSD and the Facebook posts as "instances of speech [that] underlie[] [Plaintiff's] claims in this case." [#48 at 2-3] Defendants made no objection to the inclusion of these instances of speech in the Final Pretrial Order. [*Id.* at 10-11] In response to Plaintiff's motion for summary judgment, however, Defendants asserted that the Facebook Posts are outside the scope of the Complaint, which was based on her speech regarding Mr. Barber's use of AVA funds, and should not be considered by the Court. [#56 at 6-8]

On January 16, 2024, the Court held a hearing on the pending cross-motions for summary judgment. [#69] The Court denied the motions without prejudice, and ordered Plaintiff to file an amended complaint. [*Id.*] Plaintiff's Amended Complaint was filed on January 22, 2024, and asserts three causes of action: (1) "Retaliation for Protected First Amendment Speech on a Matter of Public Concern against AVA and [Mr.] Barber pursuant to 42 U.S.C. § 1983—Financial Improprieties" [#72 at ¶¶ 645-660]; (2) "Retaliation for Protected First Amendment Speech on a Matter of Public Concern against AVA and [Mr.] Barber pursuant to 42 U.S.C. § 1983—Covid and Facebook" [*id.* at ¶¶ 661-677]; and (3) "Retaliation for Lawful Off-Duty Activity against

14

AVA" [*id.* at ¶¶ 678-683].  Defendants filed an Answer on February 23, 2024.  [#77]  The parties filed renewed cross-motions for summary judgment on March 8, 2024.  [##81; 83]  Both parties filed their respective responses on April 1, 2024 [##89; 90], and filed their respective replies on April 15, 2024 [##91; 92].

## II.    STANDARD OF REVIEW

Summary judgment is appropriate only if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett,* 477 U.S. 317, 322 (1986); *Henderson v. Inter–Chem Coal Co.,* 41 F.3d 567, 569 (10th Cir. 1994).  Where, as here, the Court is presented with cross-motions for summary judgment, the Court "must view each motion separately, in the light most favorable to the non-moving party, and draw all reasonable inferences in that party's favor."  *United States v. Sup. Ct. of N.M.*, 839 F.3d 888, 907 (10th Cir. 2016) (internal quotations omitted).

When the moving party bears the burden of persuasion at trial, "the moving party must establish, as a matter of law, all essential elements of the [claim on which summary judgment is sought] before the nonmoving party can be obligated to bring forward any specific facts alleged to rebut the movant's case."  *Pelt v. Utah*, 539 F.3d 1271, 1280 (10th Cir. 2008).  In other words, the moving party "must support its motion with credible evidence showing that, if uncontroverted, the moving party would be entitled to a directed verdict."  *Rodell v. Objective Interface Sys., Inc.*, No. 14-CV-01667-MSK-MJW, 2015 WL 5728770, at *3 (D. Colo. Sept. 30, 2015) (citing *Celotex Corp.*, 477 U.S. at 331).  "The burden then shifts to the non-moving party to produce evidence demonstrating the existence of a genuine factual issue for trial."  *Id.*

When the moving party does not bear the burden of persuasion at trial, the movant may satisfy its initial burden of making a prima facie demonstration of the absence of a genuine issue of material fact "simply by pointing out to the court a lack of evidence . . . on an essential element of the nonmovant's claim." *Adler v. Wal–Mart Stores, Inc.*, 144 F.3d 664, 670-71 (10th Cir.1998). If the movant carries this initial burden, the burden then shifts to the nonmovant "to go beyond the pleadings and set forth specific facts that would be admissible in evidence in the event of trial." *Id.* at 671 (quotation omitted).

"[A] 'judge's function' at summary judgment is not 'to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial.'" *Tolan v. Cotton*, 134 S. Ct. 1861, 1866 (2014) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986)). Whether there is a genuine dispute as to a material fact depends upon whether the evidence presents a sufficient disagreement to require submission to a jury. *See Anderson,* 477 U.S. at 248-49; *Stone v. Autoliv ASP, Inc.,* 210 F.3d 1132, 1136 (10th Cir. 2000); *Carey v. U.S. Postal Serv.,* 812 F.2d 621, 623 (10th Cir. 1987). A fact is "material" if it pertains to an element of a claim or defense; a factual dispute is "genuine" if the evidence is so contradictory that if the matter went to trial, a reasonable jury could return a verdict for either party. *Anderson,* 477 U.S. at 248. "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'" *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (*citing First Nat'l. Bank of Ariz. v. Cities Serv. Co.*, 391 U.S. 253, 289 (1968)).

III.    **ANALYSIS**

A.    **Statute of Limitations**

As discussed above, Plaintiff was terminated on October 1, 2021.  Plaintiff initiated this action on June 2, 2022.  [#1]  Plaintiff filed her amended complaint on January 22, 2024.  [#72]  Defendants argue that Plaintiff's claims based on her Facebook posts, which appear in her amended complaint, are barred under the 2-year limitations applicable to Plaintiff's state and federal claims.  [#83 at 34]  Plaintiff argues that her amendment relates back to the date of her original Complaint [#89 at 37-38], and Defendant offers no counter-argument [*see* #92].

Federal Rule of Civil Procedure 15(c)(1)(B) provides that an amendment "relates back" to the date of the original pleading if the "amendment asserts a claim . . . that arose out of the conduct, transaction, or occurrence set out . . . in the original pleading." "[R]elation back depends on the existence of a common core of operative facts uniting the original and newly asserted claims."  *Mayle v. Felix*, 545 U.S. 644, 659 (2005) (quotation omitted).  Plaintiff's claims asserted in her Amended Complaint are asserted against the same Defendants, arise out of the same occurrence as the claims in her original Complaint, are based on the same conduct by Defendants, and are grounded in the same legal theories (retaliation for First Amendment protected speech and for lawful off-duty activity).  While Plaintiff's Amended Complaint adds factual details regarding the instances of protected speech for which Defendant retaliated against her, "[t]he cause of action now, as it was in the beginning, is the same—it is a suit to recover damages for the alleged wrongful [termination] of the [Plaintiff]" in retaliation for her lawful protected speech.  *Tiller v. Atl. Coast Line R. Co.*, 323 U.S. 574, 581 (1945) (finding that an

17

amendment related back under Rule 15(c) when the amendment added a claim under a new legal theory and based on new facts, but nevertheless "related to the same general conduct, transaction[,] and occurrence"); *see also Brown v. Berthoud Fire Prot. Dist.*, No. 12-CV-03028-REB-KLM, 2013 WL 6152407, at *11 (D. Colo. Nov. 22, 2013) (adopting a magistrate judge's recommendation that an amended complaint relate back when no new defendants were added, there was a "common core of operative facts uniting the original and newly asserted claims," and the defendant made no argument and cited no law to the contrary (quotation omitted)); *Marsh v. Coleman Co.*, 774 F. Supp. 608, 612 (D. Kan. 1991) ("Amendments will relate back if they only flesh out the factual details, change the legal theory, or add another claim arising out of the same transaction, occurrence or conduct.  Relation back is denied those amendments which are based on entirely different facts, transactions, and occurrences." (citations omitted)).

Accordingly, and particularly in light of Defendants' lack of argument or authority to the contrary, the Court determines that the amendments made in Plaintiff's Amended Complaint relate back to the date of original Complaint, and are not barred by the statute of limitations.

### B.    Plaintiff's First Amendment Claims

The Court turns to Plaintiff's First Amendment claims.   "[C]itizens do not surrender their First Amendment rights by accepting public employment."   *Lane v. Franks*, 573 U.S. 228, 231 (2014).   Nevertheless, a public employer must be able to control the operations of its workplace.  *Helget v. City of Hays*, 844 F.3d 1216, 1221 (10th Cir. 2017)  Thus, "the First Amendment protection of a public employee's speech depends on a careful balance 'between the interests of the [employee], as a citizen, in

commenting upon matters of public concern and the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees.'" *Lane*, 573 U.S. at 231 (quoting *Pickering v. Board of Ed.*, 391 U.S. 563, 568 (1968)).  Courts conduct this balance using the "familiar *Garcetti/Pickering* test,"[6] which consists of the following five steps:

> (1) whether the speech was made pursuant to an employee's official duties; (2) whether the speech was on a matter of public concern; (3) whether the government's interests, as employer, in promoting the efficiency of the public service are sufficient to outweigh the plaintiff's free speech interests; (4) whether the protected speech was a motivating factor in the adverse employment action; and (5) whether the defendant would have reached the same employment decision in the absence of the protected conduct.

*Helget*, 844 F.3d at 1221 (quotation omitted).  "[T]he district court—as opposed to the trier of fact—resolves the first three *Garcetti/Pickering* inquiries." *Holub v. Gdowski*, 802 F.3d 1149, 1154 n.2 (10th Cir. 2015).  "[I]f in answering any of these three inquiries the district court concludes the speech is not protected, the analysis ends." *Id.* "If the court determines, based on its answers to the first three inquiries, that the speech is protected, the last two inquiries are ordinarily resolved by the trier of fact." *Id.* (citing *Brammer-Hoelter v. Twin Peaks Charter Acad.*, 492 F.3d 1192, 1202-03 (10th Cir. 2007)).

Plaintiff brings two claims pursuant to 42 U.S.C. § 1983 asserting violations of her First Amendment rights.[7]  Claim One alleges that Defendants retaliated against

---

[6] The test is named for the cases of *Garcetti v. Ceballos*, 547 U.S. 410 (2006) and *Pickering v. Bd. of Ed.*, 391 U.S. 563 (1968).

[7] Plaintiff moves for summary judgment "on the applicability of 42 U.S.C. § 1983 to [Plaintiff's] First Amendment Retaliation claims" because "both Defendants are persons who acted under color of state law pursuant to Section 1983." [#81 at 20-21] Defendants have stipulated that they acted under color of state law for purposes of 42 U.S.C. § 1983, and do not contend that the statute does not apply to Plaintiff's claims.

Plaintiff for two instances of protected speech: (1) Plaintiff's anonymous report to DCSD submitted on August 19, 2021 detailing Mr. Barber's improper use of AVA funds, violations of the school's anti-nepotism policy, and pay discrepancies between male and female employees; and (2) Plaintiff's CRPD email sent on September 30, 2021 reporting Mr. Barber's improper use of AVA funds to the police department (collectively, Plaintiff's "financial speech"). [#72 at ¶¶ 645-660] Plaintiff's Claim Two alleges that Defendants retaliated against Plaintiff for three instances of protected speech: (1) Plaintiff's September 24, 2021 email to DCSD reporting AVA's failure to comply with Public Health Orders; (2) Plaintiff's Facebook posts made on July 8, 2020; and (3) Plaintiff's Facebook post made on September 22, 2021. [*Id.* at ¶¶ 661-677]

Plaintiff seeks summary judgment on the first three *Garcetti/Pickering* prongs as to her first claim, and seeks summary judgment on the first four prongs as to her second claim. [*See* #81 at 1] Defendants argue that they are entitled to summary judgment on Plaintiff's first claim under the first and second *Garcetti/Pickering* prongs [#83 at 19-22 (arguing that Plaintiff's financial speech was made pursuant to her official duties), 24-25 (arguing that Plaintiff's financial speech was not on a matter of public concern)], and on Plaintiff's second claim under the second, fourth, and fifth *Garcetti/Pickering* prongs [*id.* at 25-27 (arguing that Plaintiff's Facebook Posts were not on a matter of public concern), 27-28 (arguing that Plaintiff's Facebook Posts were not a motivating factor in her termination), 28-29 (arguing that Defendants would have terminated Plaintiff in the absence of her Facebook Posts)]. Defendants also argue that Plaintiff's September 24

---

[#91-1, PSOF38, 39] The Court thus agrees that 42 U.S.C. § 1983 applies. *See, e.g.*, *Brammer-Hoelter*, 602 F.3d at 1180-81 (analyzing Section 1983 claims against a public charter school).

email to DCSD and her September 30 email to CRPD cannot support a claim for retaliation, because there is no evidence that Defendants had notice of that speech before Plaintiff's termination.      [#83 at 34-35]      The Court addresses each *Garcetti/Pickering* prong in turn.[8]

### 1.      Speech Pursuant to Official Duties

The first question in the *Garcetti/Pickering* analysis is whether the speech was made pursuant to an employee's official duties.  *See Garcetti*, 547 U.S. at 421-22. Speech made pursuant to an employee's official duties is not protected because restriction of such speech "simply reflects the exercise of employer control over what the employer itself has commissioned or created."  *Id.*  " The critical question under *Garcetti* is whether the speech at issue is itself ordinarily within the scope of an employee's duties."  *Lane*, 573 U.S. at 240.  In conducting this analysis, "[t]here are no bright line rules."  *Chavez-Rodriguez v. City of Santa Fe*, 596 F.3d 708, 713 (10th Cir. 2010). Instead, "the inquiry [is] 'a practical one,'" *Thomas v. City of Blanchard*, 548 F.3d 1317, 1323 (10th Cir. 2008) (quoting *Garcetti*, 547 U.S. at 424-25)), and a court must examine "all the facts and circumstances surrounding the speech and the employment relationship," *Brammer-Hoelter*, 492 F.3d at 1204.  "The Tenth Circuit has framed the central inquiry as 'whether the speech activity stemmed from and [was of] the type . . . that [the employee] was paid to do.'"  *Vercos v. Bd. of Cnty. Comm'rs*, 259 F. Supp. 3d 1169, 1173 (D. Colo. 2017) (quoting *Rohrbough v. Univ. of Colo. Hosp. Auth.*, 596 F.3d 741, 746 (10th Cir. 2010)).

---

[8] Because the Court resolves Plaintiff's September 24 email to DCSD and September 30 email to CRPD at the fourth prong, the Court does not consider these instances of speech in prongs one through three.

Defendants do not dispute that Plaintiff's Facebook posts fell outside of the scope of Plaintiff's official duties. As Mr. Barber testified, Plaintiff's position as AVA's Business Manager "would not have to do anything with COVID or mask enforcement or public health order enforcement." [#91-1, PSOF191] The Court finds that Plaintiff's Facebook posts fell outside of her official job duties for the purposes of the first *Garcetti/Pickering* element.

The contested issue is whether Plaintiff's report to DCSD regarding Mr. Barber's financial misconduct fell within the scope of Plaintiff's official duties. The Court must conduct a practical examination of the duties that Plaintiff was expected to perform and determine whether the report was ordinarily within the scope of those duties. *See Lane*, 573 U.S. at 240; *Thomas*, 548 F.3d at 1323. Having done so, the Court finds that Plaintiff's report to DCSD fell within the scope of her duties.

Plaintiff did not have a written job description [#92-1, DSOF7], and the parties dispute the precise contours of Plaintiff's expected duties, which generally related to financial bookkeeping [*see id*. at DSOF11-19]. The parties do not dispute that Plaintiff's duties included reporting financial discrepancies or concerns to AVA [*id.* at DSOF19], as well as submitting certain financial reports to DCSD [*id.* at DSOF18]. The parties also agree that DCSD did not supervise Plaintiff and Plaintiff fell outside of DCSD's chain of command. [#91-1, PSOF27, 29] Plaintiff did have a specific point of contact at DCSD for questions related to her required financial reporting during the relevant time—Kristen Haneke. [#92-1, DSOF 28; #83-5 at 12 (75:23-76:10)] Once Plaintiff uncovered the "financial irregularities" at issue, she contacted Ms. Haneke for guidance on how to handle the situation. [#92-1, DSOF29] Plaintiff testified that she did this "[b]ecause

that's who [Plaintiff] reported to—reported things [to]" at DCSD.  [##92-1, DSOF49; 83-5 at 14 (91:6-12)]   Ms. Haneke told Plaintiff "to make copies and to send them to . . . specific people at [DCSD]."  [#83-5 at 14 (93:1-7)]  Plaintiff was told that any submission would then have to be forwarded to AVA's Board of Directors, who would then have to research and respond to the allegations.   [#91-1, PSOF80, 83; #83-5 at 11 (72:10-14), 14 (93:18-21)]  Plaintiff did this instead of reporting the matter to Mr. Barber or anyone else at AVA because Plaintiff did not think it was "[her] job to confront [her boss]."  [#92-1, DSOF46]

Plaintiff had previously attempted to bring Mr. Barber's conduct to AVA's attention by reporting it to AVA's auditor in 2019.  [#91-1, PSOF126]  While the auditor made a recommendation regarding "receipts missing from credit card receipts," AVA did not make any changes to its policies or practices, or adequately counsel, warn, or discipline Mr. Barber.  [Id. at PSOF128-132]  Plaintiff ultimately decided to report the financial misconduct to DCSD because:  (1) Mr. Barber's conduct "was getting worse and worse every year" [#81-12 at 13 (46:10-13)]; and (2) DCSD held AVA's charter, and would "have to have [AVA] investigate [the misconduct]" [#92-1, DSOF48; #83-5 at 11 (72:3-14)].  Plaintiff compiled the records in support of her report, which she maintained and used in the course of her work as AVA's business manager, in her office.  [#91-1, PSOF87]  Plaintiff compiled these records with the help of Ms. Allspach, who Plaintiff referred to as "[Plaintiff's] assistant."  [#91-1, PSOF385-386; #81-12 at 7 (25:20-22), 18 (68:24-69:2)]

These circumstances surrounding Plaintiff's speech and her employment relationship with AVA bear similarities with those confronted by the Tenth Circuit in

*Holub*.  There, the plaintiff was employed as an internal auditor for a school district.  802 F.3d at 1151.  Her responsibilities included evaluating the district's internal accounting and operating controls, reviewing financial information, and reporting any irregularities.  *Id.*  The plaintiff had a disagreement with the district's CFO regarding salary budget reserves.  *Id.* at 1152.  She shared her findings with the district's superintendent, but felt uncomfortable reporting the issue to her supervisor, the CFO, as it created a conflict of interest.  *Id.*  After conducting research, the plaintiff determined that she should also report the issue to the district Board, despite being informed that her responsibility was simply to raise the issue with district management.  *Id.* at 1152-53.  The district held meetings regarding the plaintiff's concerns, and the superintendent determined that the concerns were unfounded.  *Id.* at 1152.  The plaintiff was not satisfied, and continued to reiterate her view.  *Id.*  After an independent expert reviewed the budget and reported that the plaintiff's concerns were unfounded, the plaintiff met with two Board members at a member's home office to discuss her concerns.  *Id.* at 1152-53.  The Board members determined that the plaintiff's concerns were unfounded, and the plaintiff was terminated shortly thereafter for her inability to move past the issue.  *Id.* at 1153.  The plaintiff brought an action against the school district alleging, amongst other claims, that the school district violated her First Amendment rights.  *Id.* at 1153-54.  The district court granted summary judgment to the school board on the plaintiff's First Amendment claim.  *Id.* at 1154.  On appeal, the Tenth Circuit affirmed, concluding that the plaintiff's report to the Board members "fell squarely within the scope of [the plaintiff's] ordinary and usual responsibilities," which included "uncovering and reporting any potentially unlawful budgeting practices."  *Id.* at 1156.

Here, Plaintiff had a similar duty to maintain AVA's financial records, make various financial reports to DCSD, and report financial discrepancies to AVA. Upon discovering what she perceived to be financial irregularities through the course of her job, Plaintiff attempted to address these issues by reporting them to AVA's auditor. When AVA did not take appropriate action and the irregularities worsened, Plaintiff reached out to her point-of-contact at DCSD for guidance. Plaintiff was informed that she could submit materials to DCSD, and that her allegations would then be forwarded to AVA with a requirement that AVA investigate the misconduct. Plaintiff testified that this is the reason that she elevated her concerns to DCSD, as it would "have to have the school investigate [the concerns]." [#83-5 at 11 (72:3-14)] As in *Holub*, while Plaintiff's report to DCSD was certainly not "customary," it was nevertheless made pursuant to her official duties maintaining AVA financial records and reporting potential discrepancies. 802 F.3d at 1156.

Notably, the plaintiff in *Holub* recognized that she had a responsibility to report her concerns to the Board directly, and this understanding was shared by various Board members and the district superintendent. *See id.* In contrast, here the parties agree that DCSD was outside of Plaintiff's chain of command. Plaintiff contends that *Holub* is therefore distinguishable, as Plaintiff did not have an undisputed duty to speak to DCSD on this topic specifically, but instead spoke "as a member of the public to [an] independent, third-party agenc[y] in a manner that was not required by her job duties." [#89 at 13]

The Court is not persuaded. As an initial matter, an employee's speech need not be "explicitly required as part of her day-to-day job responsibilities" in order to fall within

the scope of the employee's official duties.  *Chavez-Rodriguez*, 596 F.3d 708, 716 (10th Cir. 2010) (quoting *Green v. Bd. of Cnty. Comm'rs*, 472 F.3d 794, 800 (10th Cir. 2007)).  Instead, "an employee's statements are made pursuant to official duties when they stemmed from and were the type of activities that she was paid to do." *Id.* (quotation omitted).  As discussed above, such is the case here.  Regarding Plaintiff's argument that her report falls outside the scope of her official duties because DCSD was not in her chain of command, the Court agrees that this weighs against the Court's conclusion.  Indeed, "speech directed at an individual or entity outside of an employee's chain of command is often outside of an employee's official duties." *Rohrbough*, 596 F.3d at 747 (collecting cases).  "But an employee's decision to go outside of their ordinary chain of command does not necessarily insulate their speech." *Id.*  "Rather, . . . the proper focus is ultimately still whether the speech 'stemmed from and [was of] the type . . . that [the employee] was paid to do,' regardless of the exact role of the individual or entity to which the employee has chosen to speak." *Id.* (quoting *Green*, 472 F.3d at 798); *see also Chavez-Rodriguez*, 596 F.3d at 716 (explaining that Tenth Circuit precedents "provide that whether an employee's speech was made outside the chain of command merely helps inform the court as to whether the speech was made pursuant to one's employment[, but do not] establish a per se rule that speaking outside the chain of command is protected").

Here, while the fact that Plaintiff made the report outside of her chain of command weighs against the Court's conclusion, it does so only slightly.  DCSD occupied a unique position with respect to both AVA and Plaintiff.  It held AVA's charter, and had procedures providing that DCSD would inform AVA of the allegations and

require AVA to investigate.  [#921-1, DSOF48]   And Plaintiff had financial-reporting responsibilities to DCSD.  Indeed, in determining the proper procedure for submitting her report, Plaintiff reached out specifically to the person "who [Plaintiff] reported to— reported things [to]" at DCSD.  [#92-1, DSOF49; #83-5 at 14 (91:6-12)]   In light of Plaintiff's financial-reporting obligations to DCSD, her duty to report financial discrepancies (to AVA, at least), and her stated purpose of making the report to DCSD in order to bring the allegations before AVA and force AVA to investigate, the Court concludes that DCSD's position outside of Plaintiff's chain of command does not remove Plaintiff's report of financial misconduct by her direct supervisor from the scope of her official duties.  *See Cheek v. City of Edwardsville*, 514 F. Supp. 2d 1220, 1231-33 (D. Kan. 2007) (finding that city police officers acted within the scope of their official duties—specifically to investigate criminal conduct and conduct internal affairs investigations—when they reported allegations of misconduct by their Chief of Police and a city councilman to the Kansas Attorney General, even though city procedures called for reports to be made to the Chief of Police and the District Attorney's Office), *aff'd*, 324 F. App'x 699, 700 (10th Cir. 2008) (explaining that the focus of the analysis is not on "the nature of the agency [to which the plaintiffs reported], but on the nature of the plaintiff's job duties").[9]

Plaintiff relies on the Tenth Circuit's opinions in *Reinhardt*, *Thomas*, *Brammer-Hoelter*, and *Casey* as support for her argument that her speech to DCSD fell outside of

---

[9] Plaintiff attempts to distinguish *Cheek* by arguing that, while the police officers had a job duty to investigate and report criminal activity, Plaintiff's duties "did not include investigating and reporting financial misconduct."  [#89 at 13-14]  But Plaintiff did have a duty to accurately keep AVA's financial records and report discrepancies.  [#92-1, DSOF18-19]  Plaintiff's report to DCSD of continuing discrepancies, uncovered within the scope of her bookkeeping duties, did not exceed the scope of these duties.

her official duties.   [#89 at 12, 15-17]   As summarized in *Reinhardt*, these cases "generally identif[y] two factors that suggest an employee was speaking as a private citizen rather than pursuant to her job responsibilities:   (1) the employee's job responsibilities did not relate to reporting wrongdoing and (2) the employee went outside the chain of command when reporting the wrongdoing."   595 F.3d at 1135-36 (citing *Thomas*, 548 F.3d at 1324-25; *Brammer–Hoelter*, 492 F.3d at 1204-05; *Casey*, 473 F.3d at 1330-33).  The Tenth Circuit has recently summarized these same cases as holding that "plaintiffs speak personally as citizens, outside their official duties, when speaking out against wrongdoing in a citizen forum with no job responsibility to report the wrongdoing, when engaging in categories of activity for which they are not paid, and when complaining to authorities about operational issues for which they bear no responsibility." *Pryor v. Sch. Dist. No. 1*, 99 F.4th 1243, 1251 (10th Cir. 2024)  (citing, respectively, *Brammer-Hoelter*, 492 F.3d at 1204-05; *Thomas*, 548 F.3d at 1325; and *Casey*, 473 F.3d 1332-33).   So, for example, the plaintiff in *Reinhardt*—a speech-language pathologist employed at a high school—did not speak pursuant to her official duties when, after unsuccessfully raising concerns using internal mechanisms, she consulted an attorney and filed an Individuals with Disabilities Education Act ("IDEA") complaint with the state public education department.  595 F.3d at 1130, 1135-37.  As to the first factor—relating to the plaintiff's job responsibilities—the court explained that the plaintiff "was not hired to ensure IDEA compliance at Albuquerque public schools," but to "provide speech and language services to special education students."  *Id.* at 1136.  Therefore, her private consultation of an attorney and filing of a state complaint "went well beyond her official responsibilities" of providing speech and language

services. *Id.* As for the second factor—relating to the plaintiff's chain of command—the court determined that the plaintiff's complaint to the state education board went "beyond [the] realm" of the internal mechanisms that the plaintiff had previously utilized. *Id.* at 1136-37.

This case is different. Plaintiff's job duties plainly "relate[d] to" tracking AVA's finances and reporting the financial misconduct that she discovered. *Id.* at 1135-36. Put differently, Plaintiff had an undisputed "job responsibility to report the wrongdoing." *Pryor*, 99 F.4th at 1251; [#92-1, DSOF19]. Stated yet a third way, Plaintiff was not "complaining to authorities about operational issues for which [she bore] no responsibility." *Pryor*, 99 F.4th at 1251. And, for the reasons discussed above, Plaintiff's report to DCSD can hardly be considered "beyond the realm" of Plaintiff's reporting responsibilities. *Reinhardt*, 595 F.3d at 1137. Plaintiff had reporting obligations to DCSD, and her report was ultimately made in order to set the allegations before the AVA Board for investigation—well within the realm of Plaintiff's official duties.[10]

---

[10] The Court acknowledges that Plaintiff's report to DCSD also reported improper bidding procedures, payroll discrepancies between men and women, and nepotism. [#91-1, PSOF86] This speech largely fell within the scope of her official duties for similar reasons, as Plaintiff was responsible for processing payroll and invoicing, and making reports of discrepancies. [#92-1, DSOF11, 19, 27] Even Plaintiff's report of nepotism is largely a report of payroll discrepancy. [#83-10 at 2 (reporting that one of the individuals involved "only used one day of PTO and therefore was eligible to be paid the rest out in June," and that the department with the offending conduct "had payroll issues earlier in the year")] In any event, to the extent that reporting nepotism or equal pay violations fell outside of Plaintiff's job duties, the facts and circumstances of Plaintiff's speech plainly indicate a primary purpose of disclosing financial-related misconduct that Plaintiff had uncovered during her work and had a duty to bring to AVA's attention.
    Nor does the fact that Plaintiff stated her belief in her report that Mr. Barber "should be going to jail" remove this speech from the scope of Plaintiff's job duties.

Finally, in arguing that the report was not created as part of her official duties, Plaintiff points to issues related to her creation of the report—specifically, Plaintiff argues that:  No one at AVA instructed Plaintiff to make her report; Plaintiff worked on the report at home on her personal laptop; Plaintiff hand-delivered the report to DCSD; and Plaintiff did not use AVA letterhead for the report.  [#81 at 9-10]  To be sure, these facts are relevant to the Court's analysis.  *See Brammer-Hoelter*, 492 F.3d at 1204 (instructing courts to "take a practical view of all the facts and circumstances surrounding the speech and the employment relationship").  But other relevant facts cut the opposite direction.  For example:  Plaintiff compiled the relevant records in her office, and with the aid of her assistant [##91-1, PSOF386; 92-1, DSOF41]; *cf. Casey*, 473 F.3d at 1331 (finding it "notable" that the plaintiff "acted not on her own" in her speech, but gave directions to a subordinate regarding the speech);[11] and sought out and acted upon the guidance of an individual at DCSD that she "reported to—reported things to" in the course of her duties [##92-1, DSOF49; 83-5 at 14 (91:6-12)].

Ultimately, what matters is whether Plaintiff's speech "reasonably contribute[d] to or facilitate[d] [her] performance of [her] official dut[ies]," *Reinhardt*, 595 F.3d at 1136

---

[#83-10 at 2]  To be sure, there is no indication that Plaintiff had a job duty to institute criminal charges against a fellow employee.  But a brief reference to jail does not indicate that Plaintiff acted as a citizen in making this work-related report.  As discussed, Plaintiff made the report to DCSD because DCSD held AVA's charter and could force AVA to investigate, not because DCSD could reasonably be expected to institute criminal charges against Mr. Barber.

[11] The Court acknowledges that, in *Casey*, the plaintiff "order[ed]" the subordinate to contact the outside officials, and the subordinate did not "blanch at [the plaintiff's] direction."  473 F.3d at 1331.  There is no evidence that Plaintiff "ordered" Ms. Allspach to take any action, nor is the Court aware of Ms. Allspach's reaction to assisting.  Nevertheless, the Court finds that Plaintiff's involvement of her assistant, particularly while on AVA property, weighs at least as much in favor of finding that Plaintiff acted within the scope of her official duties as the fact that Plaintiff's report was not on AVA letterhead weighs against it.

(quoting *Brammer-Hoelter*, 492 F.3d at 1203), and whether it "stemmed from and [was of] the type . . . that [Plaintiff] was paid to do," *Rohrbough*, 596 F.3d at 746 (quoting *Green*, 472 F.3d at 801). Plaintiff had duties to accurately maintain AVA's finances and payroll, make financial reports to DCSD, and bring financial discrepancies to AVA's attention. Because Plaintiff's speech to DCSD regarding Mr. Barber's financial misconduct and AVA's payroll issues stemmed from and facilitated these duties, and was of the type of work that Plaintiff was paid to do, the speech fell within the scope of Plaintiff's official duties. It is therefore not protected by the First Amendment.

## 2.      Matter of Public Concern

The second question in the *Garcetti/Pickering* analysis is whether the subject of the speech at issue is a matter of public concern. *See Brammer-Hoelter*, 492 F.3d at 1202-03. "[C]onstitutional protection extends only to speech on matters of public concern." *Bunger v. Univ. of Okla. Bd. of Regents*, 95 F.3d 987, 991 (10th Cir. 1996) (quotation omitted). "Matters of public concern are 'those of interest to the community, whether for social, political, or other reasons.'" *Brammer-Hoelter*, 492 F.3d at 1205 (quoting *Lighton v. Univ. of Utah*, 209 F.3d 1213, 1224 (10th Cir. 2000)). In contrast, matters that are "internal in scope and personal in nature" are not of public concern. *Id.* at 1206 (quoting *Bunger*, 95 F.3d at 992). "Whether an employee's speech addresses a matter of public concern must be determined by the content, form, and context of a given statement, as revealed by the whole record." *Connick v. Myers*, 461 U.S. 138, 147-48 (1983).

Defendants primarily argue that the Facebook Posts did not address a matter of public concern, and are therefore not protected, because they conveyed Plaintiff's

"personal views," and did not disclose any malfeasance on the part of Defendants.[12]
[##83 at 26-27; 90 at 10-12]   Defendants rely on Tenth Circuit cases assessing the
"public concern" prong of the *Garcetti/Pickering* analysis which state that, to be
protected, speech related to governmental misconduct "must 'sufficiently inform the
issue as to be helpful to the public in evaluating the conduct of the government.'"
*Withiam v. Baptist Health Care of Okla., Inc.*, 98 F.3d 581, 583 (10th Cir. 1996) (quoting
*Wilson v. City of Littleton*, 732 F.2d 765, 769 (10th Cir. 1984)) (emphasis omitted); *see
also Koch v. City of Hutchinson*, 847 F.2d 1436, 1447 (10th Cir. 1988) (holding that an
employee's speech was not of public concern when it "did not 'sufficiently inform the
issue as to be helpful to the public in evaluating the conduct of government'" (quoting
*Wilson*, 732 F.2d at 768)).

But statements regarding governmental misconduct are not the only category of
protected speech in the context of public employment.  *See Brammer-Hoelter*, 492 F.3d
at 1205 ("Matters of public concern are 'those of interest to the community, whether for
social, political, or other reasons.'" (quoting *Lighton*, 209 F.3d at 1224)).  For example,
in *Rankin v. McPherson*, a clerical employee in a county constable's office was fired
after hearing of an assassination attempt on the President of the United State and
remarking to a co-worker:  "[I]f they go for him again, I hope they get him."  483 U.S.
378, 380-81 (1987).  After "[c]onsidering the statement in context, as *Connick* requires,"
the Supreme Court held that the statement "plainly dealt with a matter of public

---

[12] Defendants also briefly assert that the inclusion of insulting or inappropriate
comments in the Facebook Posts and the Defendants' concern about the nature of such
comments should impact the public concern analysis.  [#83 at 26]  But "[t]he
inappropriate or controversial character of a statement is irrelevant to the question
whether it deals with a matter of public concern."  *Rankin v. McPherson*, 483 U.S. 378,
387 (1987).

concern," and proceeded to the balancing analysis required by *Pickering*.  *Id.* at 386, 388.  The Tenth Circuit has similarly subjected public employees' speech to *Pickering* balancing when the employees were terminated for nonverbal expression "neither at work nor about work."[13]  *Flanagan v. Munger*, 890 F.2d 1557, 1562 (10th Cir. 1989) (holding that the ownership of a video store that rented pornographic films was "protected expression" subject to "the balancing portion of the *Pickering* test").  In doing so, the Tenth Circuit favorably quoted an excerpt from a Fourth Circuit case stating that:

> The principle that emerges is that *all* public employee speech that by content is within the general protection of the first amendment is entitled to at least qualified protection against public employer chilling action except that which, realistically viewed, is of purely "personal concern" to the employee—most typically, a private personnel grievance.

*Id.* at 1565 (quoting *Berger v. Battaglia*, 779 F.2d 992, 998 (4th Cir. 1985)) (emphasis in original).  And while *Flanagan* involved the plaintiff's nonverbal expression—owning a video store that rented pornographic films—the court explained that "[i]f plaintiffs had made off-duty [verbal] statements supporting sexually explicit films, *those comments would almost surely relate to a matter of public concern*."  *Id.* at 1563 (emphasis added). These off-duty statements contemplated by the Tenth Circuit would plainly have no relationship to government malfeasance.

Applying these principles, a district court in this Circuit "reject[ed] defendants' argument that plaintiff's speech, as a matter of law, is not protected because plaintiff . . .

---

[13] To be sure, the court in *Flanagan* declined to apply the "public concern" test to the expression at issue, holding that "the public concern test does not apply when public employee nonverbal protected expression does not occur at work and is not about work."  890 F.2d at 1564.  The Court further indicated that the "public concern test" may not even apply to any "areas in which the employee does not speak at work or about work."  *Id.*  Neither party appears to advocate for this Court to stray from the traditional "public concern" inquiry in this case, and the Court does not address whether another test would be appropriate under these circumstances.

did not intend to 'bring to light actual or potential wrongdoing or breach of public trust by a public official or to disclose any evidence of corruption, impropriety, or other malfeasance within a governmental entity.'" *Smith v. City of Mission*, No. 15-2591-JWL, 2015 WL 2401004, at *3 (D. Kan. May 15, 2015).  The court explained that the Tenth Circuit "has never construed protected speech so narrowly."  *Id.* at *3.  To the contrary, the court found that—as a matter of clearly established law—the plaintiff's speech touched on a matter of public concern because it "[went] beyond a discussion of internal workplace issues" and "addressed an issue 'of interest to the community,'" despite not conveying a message regarding governmental wrongdoing.  *Id.* at *4-5 (quoting *Lytle v. City of Haysville*, 138 F.3d 857, 863 (10th Cir. 1998)).

Pursuant to these authorities, this Court similarly rejects the argument that Plaintiff's speech must have been with a purpose to bring any wrongdoing on behalf of Defendants to light in order to be entitled to First Amendment protection.  What matters, instead, is whether the content of the speech "involve[d] a matter of interest to the community," *Nixon v. City & Cnty. of Denver*, 784 F.3d 1364, 1367 (10th Cir. 2015), and "whether the speaker's purpose was to bring [such a matter] to the public's attention or to air a personal grievance," *Porter v. Regents of Univ. of Colo.*, No. 22-CV-00335-MDB, 2023 WL 2664207, at *14 (D. Colo. Mar. 28, 2023) (quoting *Moore v. City of Wynnewood*, 57 F.3d 924, 932 (10th Cir. 1995)).

After examining the content, form, and context of Plaintiff's Facebook Posts, the Court concludes that Plaintiff's speech contained therein was a matter of public

concern.  The Plaintiff's speech in the Facebook Posts, as understood by Defendants,[14]

primarily concerned the safety and efficacy of COVID-19 vaccines.  [*See* #91-1,

PSOF437, 446]  In the first exchange, Plaintiff added her input to a lengthy discussion

regarding the safety of vaccines and opinions towards vaccine mandates, particularly as

they related to schoolchildren.  [*See generally* #81-22; *see also* #91-1, PSOF148]  The

discussion involved over a dozen individuals.  [*Id.*]  In response to multiple individuals

stating that they refused vaccines for their children based on research that they had

conducted, Plaintiff stated:   "I did lots of research and vaccinated both my son and

daughter. You're welcome."  [##81-21; 81-22]  Another individual who had an opposing

viewpoint responded to Plaintiff's statement, and the two engaged in a back-and-forth

discussion.  [*Id.*]  Candidly, the discussion devolved—with Plaintiff telling the other

individual to "enjoy [her] cancer," and the other individual stating that she "pit[ied]"

Plaintiff's children and sarcastically asking for "someone [to] pass this bitch a cookie."

[#81-22 at 14-16]  But the core communication related to which viewpoint regarding

vaccines (and, as Defendants understood it, COVID-19 vaccines specifically) was more

supported and more protective of children. This topic is one of public concern.  *See*

*Arthur v. Offit*, No. CIV.A. 01:09-CV-1398, 2010 WL 883745, at *4 (E.D. Va. Mar. 10,

2010) (finding that "the safety of vaccines and the risks and benefits of childhood

immunization protocols" is "indisputably . . . a matter of substantial public concern"); *see*

*also Lee v. Nicholl*, 197 F.3d 1291, 1297 (10th Cir. 1999) ("[S]peech concerning public

safety is protected by the First Amendment."); *Malone v. WP Co., LLC*, No. 3:22-CV-

00046, 2023 WL 6447311, at *5 (W.D. Va. Sept. 29, 2023) (finding that "the COVID-19

---

[14]  The employer's understanding of the speech controls, even if mistaken.   *See*
*Heffernan v. City of Paterson, N.J.*, 578 U.S. 266, 270-73 (2016).

pandemic and whether government-approved vaccines are effective" are "clearly . . . matters of public concern" (quotation omitted)).  And, putting aside the "inappropriate or controversial character" of Plaintiff's speech, *see Rankin*, 483 U.S. at 387, the Court finds that the discussion sought to bring the public's attention to the benefits of vaccinating school children and not Plaintiff's own personal grievances.  *See Hernandez v. City of Phoenix*, 43 F.4th 966, 978-79 (9th Cir. 2022) (explaining that the "distasteful character" of a plaintiff's social media speech "does not strip it of all First Amendment protection"); *Liverman v. City of Petersburg*, 844 F.3d 400, 410 (4th Cir. 2016) (rejecting "attempts to divide[] [speech] into discrete components to conduct a constitutional analysis on each" (quotation omitted)).

A similar analysis applies to the second Facebook post.  There, Plaintiff states that she has received the COVID-19 vaccine in order to "be able to reduce the spread, travel[,] and not have to wear a mask per our public health order."  [#81-23]  Plaintiff states her belief that others should "get a vaccination or wear a mask to protect others," and that doing so is "good for the human race."  [*Id.*]  Plaintiff concludes by encouraging others to "ask YOUR [doctor] what they think, [because] they'll suggest the vaccine and administer it while wearing a mask!!!"  [*Id.*]  Plaintiff's post received numerous responses from different individuals, many of whom supported her viewpoint and many of whom opposed it.  [#81-24]  Again, Plaintiff's speech contains arguably offensive content, with Plaintiff stating that the "[c]onspiracy theories, and big pharma stuff is bullshit . . . STFU!!"  [#81-23]  But the plain message of Plaintiff's speech—supporting the COVID-19 vaccine for adults and encouraging others to consult with their doctors on receiving the vaccine—was one of deep interest to the community.   *Malone*, 2023 WL

6447311, at *5; *see also* [#81-7 at 18 (71:10-11) (Mr. Barber testifying on behalf of AVA that "COVID clearly was a hot topic and a big deal at the time")]

The Court further rejects Defendants' argument that speech contained in the Facebook Posts was not intended to be "disseminated publicly" because the speech was not, for example, "submitt[ed] . . . to a local publication for dissemination" or made "out loud" at "a public meeting of the DCSD or AVA Board of Directors."  [#92 at 10-11] In both instances of speech on Facebook, the conversation that Plaintiff was posting into or that resulted from Plaintiff's post involved numerous engaged individuals representing a broad swath of viewpoints.  Indeed, Defendants acknowledge that Plaintiff's posts caused "parents and staff" within the AVA community to ask questions, and that "[m]ultiple employees" shared Plaintiff's posts with AVA.  [#91-1, PSOF366 (Defendants' response)]  The Court is therefore confident that Plaintiff's speech made on Facebook was disseminated at least as publicly (and likely more so) than if it had been made in a "local publication" or at a school board meeting.  *See Liverman*, 844 F.3d at 407 ("A social media platform amplifies the distribution of the speaker's message."); *see also Hernandez*, 43 F.4th at 978 ("[P]ublicly posting on social media suggests an intent to communicate to the public or to advance a political or social point of view beyond the employment context." (quoting *Liverman*, 844 F.3d at 410)).

Accordingly, the Court concludes that Plaintiff's Facebook posts constituted speech on matters of public concern.

### 3.    Interest Balancing

Having determined that Plaintiff's Facebook posts were not made pursuant to Plaintiff's official duties and were made on a matter of public concern, the next question

is whether the government's interests, as employer, in promoting the efficiency of the public service, are sufficient to outweigh Plaintiff's free speech interests.  *Helget*, 844 F.3d at 1221.   Stated differently, the inquiry is whether "the government had 'an adequate justification for treating the employee differently from any other member of the public' based on the government's needs as an employer."   *Lane*, 573 U.S. at 242 (quoting *Garcetti*, 547 U.S. at 418).

In the Tenth Circuit, "[t]he only public employer interest that outweighs the employee's free speech interest is 'avoiding direct disruption, *by the speech itself*, of the public employer's internal operations and employment relationships.'"   *Trant v. Oklahoma*, 754 F.3d 1158, 1166 (10th Cir. 2014) (quoting *Brammer–Hoelter*, 492 F.3d at 1207) (emphasis in original).  But the employer need not show that the speech "*in fact* disrupted . . . internal operations and employment relationships."   *Id.* (emphasis added).   "It need[] only to establish that the speech could *potentially* become so disruptive to . . . operations as to outweigh [the employee's] interest in the speech."   *Id.* (emphasis in original).

Thus, courts are left to determine whether the weight of the actual or potential disruption to internal operations and employment relationships that are directly caused by the employee's speech is heavier or lighter than the employee's interests in freely making the speech.   "How exactly [courts] are to 'weigh' and 'balance' the radically incommensurate interests at stake in *Pickering's* [third] prong is a matter of . . . little certainty."[15]   *Casey*, 473 F.3d at 1328.  As part of this "balancing," moreover, courts

---

[15] For instance, some cases appear to consider the "disruptive" nature of an employee's speech on both sides of the ledger—both increasing the employer's interest based on the disruption that the speech caused, while simultaneously "discount[ing] [the

must consider "the manner, time, and place of the employee's expression," as well as it's "value . . . in the public debate"—as increased "value" of the speech increases the employer's "burden to justify its restriction."  *Helget*, 844 F.3d at 1222 (10th Cir. 2017) (citing *Trant*, 754 at 1166 and *Curtis v. Okla. City Pub. Sch. Bd. of Educ.*, 147 F.3d 1200, 1213 (10th Cir. 1998)).

  The Court begins with Defendants' efficiency interest, limited in the Tenth Circuit to the interest in avoiding actual or potential disruption of the public employer's internal operations and employment relationships caused by the speech itself.  *Trant*, 754 F.3d at 1166.  The Court finds that the "weight" of Defendants' interest as it relates to Plaintiff's Facebook posts approaches zero.  Viewing the facts in the light most favorable to Defendants, Defendants simply have not established that Plaintiff's speech actually disrupted AVA's operations and employment relationships, or held real potential to do so.

  As for actual disruption of this type, the most that Defendants can muster is that "questions were asked [by parents and staff] as to whether it was professional for an employee of the school to be posting on a social media platform;" AVA had "a few conversations with parents and staff [who] felt that [the speech] was an unprofessional, inappropriate remark to put on social media;" and "[m]ultiple employees shared [the speech] with AVA and were showing it around the school because . . . they couldn't believe it."  [#91-1, PSOF366 (Defendants' response) (quotation omitted)]  None of the individuals who were asking questions, involved in conversations, or sharing the speech are identified.  [*Id.*]  There is no evidence that Plaintiff's speech strained internal

---

employee's interests in making the statements] accordingly."  *See Helget*, 844 F.3d at 1223-25 (citing *Lytle*, 138 F.3d at 865).

employment relationships or harmony, impacted the ability of AVA to achieve its organizational and educational goals, or impaired Plaintiff's ability to effectively perform her job. *See Helget*, 844 F.3d at 1224 (finding that the employer's "operational interests as a public employer [were] strong" when the evidence supported a finding that the employee's speech "had a detrimental impact on her working relationship with her superiors," "would have . . . affected the regular operation of the [employer]," and "would have impeded [the employee's] ability to perform the duties essential to her job"); *see also Rankin*, 483 U.S. at 388 ("We have previously recognized as pertinent considerations whether the statement impairs discipline by superiors or harmony among co-workers, has a detrimental impact on close working relationships for which personal loyalty and confidence are necessary, or impedes the performance of the speaker's duties or interferes with the regular operation of the enterprise."). Defendants do not provide support for the notion that a public employer has an interest in restricting speech simply because it causes member of the public to have "conversations" or "ask questions." *Cf. Flanagan*, 890 F.2d at 1566 ("The department cannot justify disciplinary action against plaintiffs simply because some members of the public find plaintiffs' speech offensive and for that reason may not cooperate with law enforcement officers in the future.").

Nor does the record support a significant potential for disruption. For example, Defendants (understandably) focus on Plaintiff's statement to the parent of an AVA student to "enjoy your cancer," when arguing that Plaintiff's "inappropriate and insulting" language damaged AVA's mission. [#90 at 14-15] Defendants proffer that this type of language may "create an environment where students are encouraged to be similarly

insulting, [or] where staff members feel free to insult, or fear insult from, other members of the school community." [*Id.* at 14]  But this instance of speech occurred on July 8, 2020—well over a year before Plaintiff's termination.  [*See* #92-1, DSOF54]  Yet Defendants offer no evidence that any of the feared organizational disruptions occurred during that year (besides "a few conversations" with unidentified parents and staff), nor do they provide any reason to believe that these disruptions would materialize over a year after the speech occurred.  [*See* #91-1, PSOF370]  Relatedly, the lack of documented real-time disciplinary actions for Plaintiff's speech undercuts the strength of Defendants' fears of potential disruption.  While Mr. Barber may have had a "verbal conversation" with Plaintiff about "times where . . . she made some social media posts being angry," [#83-7 at 2 (34:10-13, 35:3-6); *see also* #92-1, DSOF62 (Plaintiff disputes that these "counselings" occurred)], the urgency of Defendants' real-time concern about Plaintiff's speech on Facebook does not correspond to the weight that Defendants now seek to place on the harms that the speech could have caused.  [*See* #78-90 at 10-11 (40:2-5, 41:6-25) (testimony that AVA was informed that it "cannot use anything on [Plaintiff's] personal Facebook page" in its employment decision, and that, when the speech was addressed with Mr. Barber, he did not instruct that any disciplinary action be taken and that he "probably just shook his head")]

For these reasons, the Court finds that Defendants have failed to establish a meaningful operational interest in avoiding direct disruption to its operations caused by Plaintiff's speech.

On the other hand, Plaintiff has established at least some interest in her speech. As discussed above, Plaintiff's Facebook posts were on a matter of public concern and

made in a manner intended to contribute to the public debate.  The Supreme Court has long recognized "a profound national commitment to the principle that debate of public issues should be uninhibited, robust, and wide-open."  *New York Times Co. v. Sullivan*, 376 U.S. 254, 270 (1964); *see also Connick*, 461 U.S. at 145 (reaffirming "that speech on public issues occupies the highest rung of the h[ie]rarchy of First Amendment values" (quotation omitted)).  While the "value" to the public debate added by Plaintiff's speech may reasonably be questioned, Plaintiff ultimately has a very low burden on this issue in light of Defendants' failure to show any meaningful actual or potential disruption to workplace efficiency caused by Plaintiff's speech.  *See Liverman*, 844 F.3d at 411 (finding that the "third prong[] of the [*Pickering*] inquiry [was] not in genuine dispute" because the employer "failed to establish a reasonable apprehension that plaintiffs' social media comments would meaningfully impair the efficiency of the workplace"); *see also Lane* 573 U.S. at 242 (holding that the employee's speech was entitled to protection when "the employer's side of the *Pickering* scale is entirely empty").

Accordingly, the Court finds that, on the record before it, Plaintiff is entitled to summary judgment on the third step of the *Garcetti/Pickering* analysis as it relates to her Facebook posts.

### 4.    Motivating Factor in Adverse Decision

The Court next considers whether "the speech was a 'substantial motivating factor' behind the employer's decision to take an adverse employment action against the employee." *Maestas v. Segura*, 416 F.3d 1182, 1187 (10th Cir. 2005).  "[T]he employee has the initial burden of establishing causation."  *Id.* at 1188.  An employee "need not prove h[er] speech was the sole reason for defendants' action," nor is the

employee "required to show 'but-for' causation."  *Id.* (quotation and citations omitted).

"Rather, the employee must show the protected speech *played a substantial part* in the

employer's decision to adversely alter the employee's conditions of employment."  *Id.*

(emphasis in original) (collecting cases).

"The motivation prong is a factual issue typically decided by a jury."  *Hedquist v.*

*Beamer*, 763 F. App'x 705, 712 (10th Cir. 2019) (citing *Trant*, 754 F.3d at 1165).

However, summary judgment is appropriate when there "is no evidence in the record

from which a trier of fact could reasonably conclude the [protected speech] was a

motivating factor in [the plaintiff's] termination." *Cypert v. Indep. Sch. Dist. No. I-050 of*

*Osage Cnty.*, 661 F.3d 477, 484 (10th Cir. 2011) (quotation omitted).  Thus, "[t]o

withstand summary judgment at step three, . . . an employee must produce evidence

linking the employer's action to the employee's speech."  *Maestas*, 416 F.3d at 1188.

"Speculation or hunches . . . will not suffice."  *Id.* at 1189.

The Court first considers Plaintiff's email to DCSD relating to public health

violations, and her email to CRPD.  Defendants assert that there is no evidence that

either AVA or Mr. Barber had any notice of these instances of speech [#83 at 34-35],

meaning that they could not have motivated the termination decision.  The facts are as

follows:  Plaintiff wrote an email to individuals at DCSD on September 24, 2021,

reporting AVA's ongoing failure to comply with public health orders.  [#92-1, DSOF88]

Plaintiff wrote an email to CRPD on September 30, 2021, reporting Mr. Barber's

financial misconduct.  [*Id.* at DSOF69]  Plaintiff was terminated on October 1, 2021,

before lunch, around 10:00 a.m.  [*Id.* at DSOF92]   DCSD forwarded Plaintiff's

September 24 email to counsel for AVA, Mr. Miller, on October 1, 2021 at 1:51 p.m.  [*Id.*

at DSOF91]  Mr. Miller forwarded the email to Mr. Barber and others on October 4, 2021, with a note that "it wasn't sent to us until after [Plaintiff's] employment was terminated."  [*Id.* at DSOF90; #83-14 at 1]  Mr. Barber testified that the first time he or AVA learned of the CRPD email was in preparing for his deposition related to this litigation.  [#83-7 at 10 (76:11-77:22)]  Thus, based on this timeline, neither Mr. Barber nor anyone employed by AVA (Plaintiff excepted) had notice of Plaintiff's emails to DCSD or CRPD prior to her termination.

Plaintiff contends that DCSD's contact with Mr. Miller was not the first notice that AVA received of the DCSD email.  [#92-1, DSOF90 (Plaintiff's response)]  Plaintiff also contends that CRPD informed AVA and Mr. Barber of her email before Plaintiff's termination.  [*Id.* at DSOF74 (Plaintiff's response)]  In support of these contentions, however, Plaintiff offers only speculation, and no evidence.  The only evidentiary support that Plaintiff cites for the notion that AVA received notice of Plaintiff's speech to DCSD before the email in the record is "Plaintiff's Exhibit 37."  [#92-1, DSOF90 (citing #81-37]  Plaintiff's Exhibit 37 is a letter dated August 31, 2021 (nearly a month before Plaintiff sent her email to DCSD) from the DCSD General Counsel to Mr. Miller.  [#81-37]  The content of the letter regards an entirely separate report that Plaintiff made to DCSD—the financial report that she submitted on August 20, 2021.  [*Id.*]  Within that letter, DCSD's General Counsel references "our telephone conversation yesterday"— indicating that DCSD's General Counsel and Mr. Miller had spoken on the phone on August 30, 2021 regarding Plaintiff's August 20 report.  [*Id.*]  Supported only by this fragment of a sentence, Plaintiff posits that "[w]hen reporting public complaints received about AVA, the practice of DCSD's counsel was to call Mr. Brad Miller and to inform him

of the complaint on the phone prior to emailing a copy of the complaint to him in the days following that call."   [#92-1, DSOF90]   Plaintiff's inference that because it happened once it must be "practice" is mere speculation, and does not suffice to meet Plaintiff's burden at summary judgment.  *See Waller v. City & Cnty. of Denver*, 932 F.3d 1277, 1287 (10th Cir. 2019) ("[W]e have found no cases suggesting that a single prior incident can constitute a 'pattern' of conduct."); *Martin v. Malhoyt*, 830 F.2d 237, 255 (D.C. Cir. 1987) (holding, in the context of municipal liability, that "[o]ne instance . . . does not a pattern or practice make").

Plaintiff's theory regarding the CRPD email fares no better.  Plaintiff "believes that the CRPD informed AVA and Mr. Barber of her September 30, 2021 email through Mr. Todd West, a current AVA employee and former CRPD police officer who was present during the termination of her employment the next day."  [#92-1, DSOF74]  For support, Plaintiff cites only her own testimony, which in turn states her belief and indicates that she had no other grounds for her belief besides Mr. West's former employment at CRPD.[16]   [*Id.* (citing 81-12 at 27 (104:16-105:14)]  Plaintiff's hunch that Mr. West received a copy of Plaintiff's email to CRPD simply because he used to work at CRPD does not meet her burden on summary judgment.  *Maestas*, 416 F.3d at 1189.

In sum:

> [Plaintiff] did not introduce any evidence that [Defendants] were aware of these statements at the time [Defendants took the adverse action]. [Plaintiff] can only argue that there was temporal proximity between [her] speech] and [her] termination.  But this does not create a genuine issue of

---

[16] The Court notes that the cited testimony does not even support the assertion that Mr. West was "present during [Plaintiff's] termination," and it is not the Court's duty to search Plaintiff's 1,300 pages of exhibits to find evidentiary support for Plaintiff's stated fact.

material fact as to whether [Plaintiff's speech] was a motivating factor in [her] termination.

*Trant*, 754 F.3d at 1166 n.3 (citing *Butler v. City of Prairie Village*, 172 F.3d 736, 746 (10th Cir.1999)); *see also Maestas*, 416 F.3d at 1189 ("[T]emporal proximity is insufficient, without more, to establish such speech as a substantial motivating factor in an adverse employment decision.").  The Court therefore finds that there is no dispute of material fact as to Plaintiff's emails to DCSD or CRPD, and that summary judgment in favor of Defendants is appropriate as to these instances of speech.

The Court next considers Plaintiff's Facebook posts.   Here, Plaintiff has presented evidence both that Defendants knew of the speech and that the speech was at least "part of the reason" for Plaintiff's termination, or "a small piece of" what Defendants considered.   [#91-1 at PSOF432-433]   Defendants argue that they considered a host of other conduct in deciding to terminate Plaintiff, and that the Facebook posts were merely a small, insubstantial part of that ultimate decision.  [#83 at 27-28]  The Court finds that a genuine dispute exists regarding the weight that Defendants placed on Plaintiff's Facebook posts when deciding to terminate her, and that summary judgment for either party is inappropriate on this prong as it relates to Plaintiff's Facebook posts.

A reasonable factfinder could determine that Plaintiff's Facebook posts played a substantial part in Defendants' decision to terminate Plaintiff.  Both Ms. Garcia and Mr. Barber identified Plaintiff's Facebook posts, among other things, when asked to identify the grounds for Plaintiff's termination.  [*See* #91-1, PSOF431-433]  This, despite Mr. Miller's alleged instruction that AVA "cannot use anything on [Plaintiff's] personal Facebook page" in making employment or disciplinary decisions.  [*Id.* at PSOF373]

Plaintiff's thin-to-nonexistent disciplinary history further supports her argument, as the record indicates that Defendants had notice of Plaintiff's other alleged misconduct well before Plaintiff's termination, but took no action.  [*See id.* at PSOF66-69 (undisputed that Plaintiff's personnel file contained no negative performance reviews or evaluations, disciplinary actions, counselings, or written or verbal warnings); *see also* #92-1, DSOF76-77]  To the contrary, Plaintiff received consistent raises and bonuses on the basis of her job performance.  [#91-1, PSOF49-56]  In addition, there is evidence indicating that Plaintiff's viewpoint on COVID-19 vaccines and masks did not align with that of AVA's leadership, providing support for the inference that Plaintiff's speech on this topic was particularly disfavored.   [*See* #81-27 (message from AVA Board President, Troy Schroeder, contemplating the costs of AVA choosing to "[c]ompletely ignore the public health order" that required students and staff to wear masks, and stating that he "personally ha[d] the stomach for that fight")]

On the other hand, Defendants' testimony does indicate that the Facebook posts may have only been a "small piece of" what Defendants considered.  [#81-7 at 23 (90:1-12)]  Defendants also rely on, for example, documented negative interactions with staff, mistakes raised by the finance committee, and being late with required audits.  [*Id.* at 20-21 (80:11-81:15)]  Looked at in the light most favorable to Defendants, the record could be construed to indicate that the Facebook posts exerted "little or no influence on the employer's decision," such that it "cannot be said to have played a *substantial* part in the employment decision."   *Maestas*, 416 F.3d at 1188 n.6 (emphasis in original).  Plaintiff, of course, disputes the legitimacy of these alternative reasons—arguing that they were part of a "pretextual . . . search for unprofessional conduct *after* the decision

to terminate" Plaintiff for protected speech had already been made.   [#89 at 29 (emphasis in original)]  But the record could be read to support the opposite conclusion as it relates to the Facebook posts, with the Facebook posts being unearthed and provided as "more of the unprofessional behavior" only after Mr. Barber and AVA leadership had already recommended that AVA consider terminating Plaintiff.  [*See* #91-1, PSOF403-410]

Ultimately, the record is not so clear on the role that Plaintiff's Facebook posts played in her termination as to merit summary judgment for either Plaintiff or Defendants.  Instead, the issue should remain with the factfinder, as is typical in cases such as this.  *Trant*, 754 F.3d at 1165.

### 5.    Same Employment Decision

Defendants briefly seek summary judgment on the fifth prong of the inquiry, which asks whether the defendant would have reached the same employment decision in the absence of the protected conduct.  [#83 at 28-29]  Defendants' argument is less than half a page, and relies on the argument addressed above that Defendants had other grounds for terminating Plaintiff.  [*Id.*]  Defendants further acknowledge that "[t]his element is 'ordinarily' resolved by the trier of fact."  [*Id.* (quoting *Brammer-Hoelter*, 492 F.3d at 1203)]

For the reasons discussed above, the Court determines that a genuine issue of fact exists regarding the role the Plaintiff's Facebook posts played in Defendants' decision to terminate her.  Just as this dispute precludes summary judgment regarding whether that speech was a motivating factor in Plaintiff's termination, it similarly

precludes summary judgment on whether Defendants would have made the same decision without that speech.

### 6.     Qualified Immunity

Finally, Defendants argue that Mr. Barber is entitled to qualified immunity on Plaintiff's federal claims against him.  [#83 at 29-31]  "Qualified immunity 'protects government officials from liability for civil damages insofar as their conduct does not violate "clearly established statutory or constitutional rights of which a reasonable person would have known."'"  *Weise v. Casper*, 593 F.3d 1163, 1166 (10th Cir. 2010) (quoting *Pearson v. Callahan*, 555 U.S. 223, 231 (2009), in turn quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)).  "[O]fficers are entitled to qualified immunity under §1983 unless (1) they violated a federal statutory or constitutional right, and (2) the unlawfulness of their conduct was 'clearly established at the time.'"  *District of Columbia v. Wesby*, 583 U.S. 48, 63-64 (2018) (quoting *Reichle v. Howards*, 566 U.S. 658, 664 (2012)).  With regard to the second prong of the qualified immunity analysis, the plaintiff must demonstrate that the constitutional right was clearly established at the time of the misconduct.  *Thomas v. Durastanti*, 607 F.3d 655, 662 (10th Cir. 2010).  A right is clearly established if, at the time of the conduct, existing precedent has "placed the statutory or constitutional question beyond debate." *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011).  Stated differently, "[a] clearly established right is one that is sufficiently clear that every reasonable official would have understood that what he is doing violates that right."  *Aldaba v. Pickens*, 844 F.3d 870, 877 (10th Cir. 2016) (quotation omitted). "Ordinarily this standard requires either that there is a Supreme Court or Tenth Circuit decision on point, or that the 'clearly established weight of authority from other courts

[has] found the law to be as the plaintiff maintains.'" *Patel v. Hall*, 849 F.3d 970, 980 (10th Cir. 2017) (quoting *Klen v. City of Loveland*, 661 F.3d 498, 511 (10th Cir. 2011)). "When the defendant has moved for summary judgment based on qualified immunity, [courts] still view the facts in the light most favorable to the non-moving party and resolve all factual disputes and reasonable inferences in [her] favor." *Est. of Booker v. Gomez*, 745 F.3d 405, 411 (10th Cir. 2014).

With respect to Plaintiff's financial report to DCSD, email to DCSD, and email to CRPD, Mr. Barber is entitled to qualified immunity on the first prong of the analysis. This is because, when viewing the evidence in the light most favorable to Plaintiff, Plaintiff has failed to establish that Mr. Barber violated her constitutional rights through Plaintiff's termination.

With respect to Plaintiff's Facebook posts, the Court has determined that when viewed in the light most favorable to Plaintiff, Mr. Barber violated Plaintiff's First Amendment rights by terminating her for her protected speech. The Court further finds that the unlawfulness of such conduct was clearly established at the time of Plaintiff's termination. Defendants do not explain which prong of the "familiar *Garcetti/Pickering* analysis" had not been clearly established as applied to Plaintiff's speech when Plaintiff was terminated. *Helget*, 844 F.3d at 1221. Considering the contested prongs[17] and viewing the evidence in the light most favorable to Plaintiff, the Court determines that the application of each was clearly established at the time of the injury.

---

[17] Defendants do not argue that Plaintiff's Facebook posts were made in the scope of her official duties, and the Court finds that any reasonable official would know that they were not.

50

First, concerning whether Plaintiff's speech was on a matter of public concern, clearly established law defines such speech as that which is "fairly considered as relating to any matter of political, social, or other concern to the community." *Considine v. Board of Cnty. Comm'rs*, 910 F.2d 695, 699 (10th Cir.1990) (quoting *Connick*, 461 U.S. at 146).  The Court is confident that any reasonable official would have understood that Plaintiff's speech, made in the years 2020 and 2021 concerning vaccine mandates and the efficacy of COVID-19 vaccines, fell easily within the bounds of a matter of "political, social, or other concern to the community."  Indeed, Tenth Circuit caselaw has clearly held since 1999 that "an employer . . . could reasonably have been expected to know employee speech concerning public safety is protected by the First Amendment." *Lee v. Nicholl*, 197 F.3d 1291, 1297 (10th Cir. 1999).  It was similarly clearly established that "avoiding [actual or potential] direct disruption, *by the speech itself*, of the public employer's internal operations and employment relationships" is the only employer interest capable of outweighing an employee's free speech interest  *Trant*, 754 F.3d at 1166 (quoting *Brammer–Hoelter*, 492 F.3d at 1207) (emphasis in original).  Viewing the evidence in Plaintiff's favor, there was simply no disruption of AVA's internal operations or employment relationships[18]—only distaste of Plaintiff's speech.  But such distaste does not justify action against an employee, even if it leads to some degree of friction between the employer and the public.  *See Flanagan*, 890 F.2d at 1566 ("The department cannot justify disciplinary action against plaintiffs simply because some members of the public find plaintiffs' speech offensive and for that reason may not

---

[18] Even viewing the evidence in Defendants' favor, as the Court did when evaluating Plaintiff's Motion for Summary Judgment, Defendants' assertions of actual or potential disruption are largely unsupported by the record.

cooperate with law enforcement officers in the future."). Finally, it was clearly established that, if an employee's speech proceeded past the first three prongs, then the employer may not take an adverse action against the employee that is motivated by the protected speech. *Pickering*, 391 U.S. at 574 (holding that a public employee's "exercise of his right to speak on issues of public importance may not furnish the basis for his dismissal from public employment"). Here, viewing the evidence in the light most favorable to Plaintiff, that is precisely what Mr. Barber did.[19]

Accordingly, the Court finds that Mr. Barber is not entitled to qualified immunity on Plaintiff's claim against him as it relates to her Facebook posts.

### 7.   Conclusion

For the reasons set forth above, the Court concludes as follows:

1. Plaintiff's August 19, 2021 report to DCSD was made within the scope of her official duties. Defendants are therefore entitled to summary judgment on Plaintiff's Section 1983 claims to the extent they arise from this August 19, 2021 report.

2. Plaintiff's September 24, 2021 email to DCSD and her September 30, 2021 email to CRPD were not motivating factors in Plaintiff's termination. Defendants are therefore entitled to summary judgment on Plaintiff's Section 1983 claims to the extent

---

[19] For similar reasons, the Court denies Defendants' request for summary judgment as to Plaintiff's claim for punitive damages. Punitive damages are available in Section 1983 actions "when the defendant's conduct is shown to be motivated by evil motive or intent, or when it involves reckless or callous indifference to the federally protected rights of others." *Hardeman v. City of Albuquerque*, 377 F.3d 1106, 1120-21 (10th Cir. 2004) (quotation omitted). Here, Plaintiff has presented evidence supporting an inference that Defendants (or at least AVA's counsel) knew that it was improper to terminate Plaintiff based on her Facebook posts, but did so anyways. [*See, e.g.*, #91-1, PSOF373, 439] In light of this alleged knowledge, and the clearly established law, the Court find a genuine dispute of fact as to whether Defendants acted with "reckless or callous indifference" towards Plaintiff's First Amendment rights.

that they arise from Plaintiff's September 24, 2021 email to DCSD and her September 30, 2021 email to CRPD.[20]

3. Plaintiff's speech on Facebook was not made within the scope of her official duties and was on matters of public concern.  Plaintiff's interest in making this speech outweighed Defendants' interests in promoting the efficiency of the public service.  A fact dispute exists as to whether Plaintiff's speech on Facebook was a motivating factor in her termination, and whether Defendants would have made the same termination decision absent the Facebook speech.  Accordingly, neither party is entitled to summary judgment on Plaintiff's Section 1983 claims to the extent they arise from Plaintiff's Facebook posts.

4. Mr. Barber is entitled to qualified immunity regarding Plaintiff's Section 1983 claims arising from her August 19, 2021 report to DCSD, September 24, 2021 email to DCSD, and September 30, 2021 email to CRPD because Plaintiff has not established the existence of a constitutional violation with respect to these instances of speech.

5. Mr. Barber is not entitled to qualified immunity regarding Plaintiff's Section 1983 claim to the extent it arises from her Facebook posts because, viewing the evidence in the light most favorable to Plaintiff, Mr. Barber violated Plaintiff's clearly established First Amendment rights by terminating her for her protected speech.

**C.    State Law Claim**

Plaintiff also brings one claim of Retaliation for Lawful Off-Duty Activity against AVA, pursuant to Colo. Rev. Stat. § 24-34-402.5 (the "LODAS claim").  [#72 at ¶¶ 678-

---

[20] Because the only instances of speech that Plaintiff's Claim One relies on are her August 19, 2021 report to DCSD and her September 30, 2021 email to CRPD, the Court finds that summary judgment in favor of Defendants on the entirety of that claim is appropriate.

83]  "The 'lawful activities statute' provides that '[i]t shall be a discriminatory or unfair employment practice for an employer to terminate the employment of any employee due to that employee's engaging in any lawful activity off the premises of the employer during nonworking hours' unless certain exceptions apply."  *Coats v. Dish Network, LLC*, 350 P.3d 849, 852 (Colo. 2015) (quoting Colo. Rev. Stat. § 24-34-402.5(1)) (emphasis omitted).  Both parties seek summary judgment on the LODAS claim.  [##81 at 21-22; 83 at 31-34]  Neither party is entitled to it.  To explain why, the Court considers each instance of activity below.

First, the Court agrees with Defendants that Plaintiff's September 24, 2021 email to DCSD and her September 30, 2021 email to CRPD cannot support the LODAS claim. For the reasons explained above, there is no genuine dispute of fact that Defendants did not have notice of these activities until after Plaintiff's termination.   Accordingly, there is no evidence that Plaintiff was terminated "due to" those activities, as required by the statute.

Next, the Court considers Plaintiff's Facebook posts.  Plaintiff contends that, as a matter of law, her termination was "due to" her Facebook posts—relying on the same evidence used to argue that her Facebook posts were a motivating factor for her termination under the *Garcetti/Pickering* analysis.  [#81 at 22]  Defendants similarly argue that, as a matter of law, Plaintiff's termination was not "due to" her Facebook posts—again pointing to the various other grounds for terminating Plaintiff that Defendants relied on in the *Garcetti/Pickering* analysis.  [#83 at 33-34]  For the same reasons discussed above, there is a genuine factual dispute as to the role that Plaintiff's speech on Facebook played in her termination.  Just as this dispute precludes summary

judgment on the questions of whether Plaintiff's Facebook speech was a motivating factor in her termination and whether Defendants would have terminated Plaintiff in the absence of the Facebook speech, it also precludes summary judgment on the question of whether Plaintiff was terminated "due to" her Facebook posts.

Finally, the Court considers Plaintiff's August 19, 2021 report to DCSD. As noted above, Section 24-34-402.5's general prohibition against termination for lawful off-duty activity is subject to exceptions. One such exception "allows an employer to restrict an employee's off-duty activities if those restrictions are 'reasonably and rationally related to the employment activities and responsibilities of a particular employee or particular group of employees, rather than to all employees of the employer.'" *Oransky v. Martin Marietta Materials, Inc.*, 400 F. Supp. 3d 1143, 1149 (D. Colo. 2019) (quoting Colo. Rev. Stat. § 24-34-402.5(1)(a)). Pursuant to this exception, "an employer retains the common law right to discharge an employee for conduct 'reasonably and rationally related to the employment activities and responsibilities of a particular employee.'" *Williams v. Rock-Tenn Servs., Inc.*, 370 P.3d 638, 642 (Colo. App. 2016) (quoting Colo. Rev. Stat. § 24-34-402.5(1)(a)).

Defendants argue that this exception applies to Plaintiff's August 19, 2021 DCSD report.[21] [#83 at 31-33] Plaintiff argues that Defendants' argument is waived because the exception operates as an affirmative defense, which must be raised in the pleadings [##81 at 22 n.2; 89 at 40], and Defendants' Answer does not raise Colo. Rev. Stat. § 24-34-402.5(1)(a) as an affirmative defense [#77 at p. 73-74].

---

[21] Plaintiff does not seek summary judgment on the LODAS claim on the basis of the August 19, 2021 DCSD report. [#81 at 21-22]

The Court agrees that this exception is "treated procedurally as an affirmative defense."[22]  *Williams*, 370 P.3d at 641-42 (citing *Gwin v. Chesrown Chevrolet, Inc.*, 931 P.2d 466, 470 (Colo. App. 1996)); *see also Oransky*, 400 F. Supp. 3d at 1147 ("The statutory exceptions [to Section 24-34-402.5] are affirmative defenses.").  And "[t]he general rule is that a party waives its right to raise an affirmative defense at trial when the party fails to raise the defense in its pleadings."  *Creative Consumer Concepts, Inc. v. Kreisler*, 563 F.3d 1070, 1076 (10th Cir. 2009); *see also* Fed. R. Civ. P. 8(c) ("In responding to a pleading, a party must affirmatively state any avoidance of affirmative defense.").  But the Tenth Circuit has held that "an affirmative defense was not waived for trial purposes when it had first been raised in a motion for summary judgment three months earlier," *Ahmad v. Furlong*, 435 F.3d 1196, 1202 (10th Cir. 2006) (citing *Ball Corp. v. Xidex Corp.*, 967 F.2d 1440, 1443-44 (10th Cir.1992)), and has contemplated that a defendant may "be permitted to 'constructively' amend the answer by means of the summary judgment motion."  *Id.*; *see also Brinkley v. Harbour Recreation Club*, 180 F.3d 598, 612 (4th Cir.1999) ("[T]here is ample authority in this Circuit for the proposition that absent unfair surprise or prejudice to the plaintiff, a defendant's affirmative defense is not waived when it is first raised in a pre-trial dispositive motion."); *Moore, Owen, Thomas & Co. v. Coffey*, 992 F.2d 1439, 1445 (6th Cir.1993) ("It is well established, however, that failure to raise an affirmative defense by responsive pleading does not always result in waiver."); *Grant v. Preferred Research, Inc.*, 885 F.2d 795, 797 (11th Cir.1989) ("[I]f a plaintiff receives notice of an affirmative defense by some

---

[22] Colorado law applies to this question.  *See Racher v. Westlake Nursing Home Ltd. P'ship*, 871 F.3d 1152, 1165 (10th Cir. 2017) (applying state law to the question of "[w]hether [a] statute operates as an affirmative defense . . . or whether it creates a heightened pleading requirement")

means other than pleadings, the defendant's failure to comply with Rule 8(c) does not cause the plaintiff any prejudice. When there is no prejudice, the trial court does not err by hearing evidence on the issue." (internal quotation marks and citation omitted)). Considering that this matter is still in pretrial proceedings, and there has not been a showing of prejudice at this point, the Court declines to rule that Defendants' omission of this affirmative defense in their answer constitutes a waiver.

Nevertheless, the Court declines to rule on the applicability of Colo. Rev. Stat. § 24-34-402.5(1)(a) as argued.  The Tenth Circuit, while acknowledging that under certain circumstances an unpled affirmative defense may be considered on a motion for summary judgment, has unequivocally explained that "the best procedure is to plead an affirmative defense in an answer or amended answer." *Ahmad*, 435 F.3d at 1202.  This is because "absence of prejudice to the opposing party is not the only proper consideration in determining whether to permit an amended answer; a motion to amend may also be denied on grounds such as undue delay, bad faith or dilatory motive . . . , or repeated failure to cure deficiencies by amendments previously allowed."  *Id.* (quotation omitted).  "Accordingly, courts should not permit a party to circumvent these other restrictions on amendments simply by filing a dispositive motion rather than a motion to amend."  *Id.*  Here, Defendants did not follow "the best procedure" (despite this precise concern being raised in a prior round of dispositive motions prior to the filing of Defendants' operative Answer [*see* #55 at 15-16]), and determining the merits of Defendants' affirmative defense now would deprive Plaintiff of the opportunity to argue against Defendants' proposed amendment on the grounds traditionally considered. Thus, ruling on Defendants' unpled affirmative defense at this stage may very well

impermissibly circumvent the well-established restrictions on allowing the amendment of pleadings. *Ahmad*, 435 F.3d at 1202. To the extent that Defendants seek to assert the affirmative defense established by Colo. Rev. Stat. § 24-34-402.5(1)(a) at any point in the remainder of these proceedings, Defendants must file a motion for leave to amend their answer to add this affirmative defense on or before July 5, 2024.[23]

For the reasons set forth above, neither party is entitled to summary judgment on Plaintiff's LODAS Claim. The Motions are therefore DENIED to the extent that they seek it.

## IV.   CONCLUSION

For the foregoing reasons, Plaintiff's Renewed Motion for Summary Judgment [#81] and Defendants' Renewed Motion for Summary Judgment [#83] are each **GRANTED IN PART** and **DENIED IN PART**, as set forth above. Specifically, summary judgment is **GRANTED** in favor of Defendants as to Plaintiff's Claim One. Summary judgment is **DENIED** as to each party on Plaintiff's Claim Two and Claim Three.

DATED: June 20, 2024                    BY THE COURT:

                                        s/Scott T. Varholak
                                        United States Magistrate Judge

---

[23] In the event that any such motion is granted, the Court would further consider a request to file an additional motion for summary judgment solely on the applicability of this affirmative defense to Plaintiff's LODAS claim.